## CRANE COMPANY et al. v. SEARS.

No. 21672.　June 26, 1934.

Rehearing Denied Sept. 18, 1934.

Shirk, Danner & Phelps, Charles E. Earnheart, Samuel O. Neff, William H. Fuller, George M. Porter, and J. L. Fuller, for plaintiffs in error.

Carl Monk, Frank D. McSherry, and John C. Monk, for defendant in error.

RILEY, C. J. This is an appeal from a judgment for damages for the alleged wrongful death of L. C. Sears, husband of defendant in error.

L. C. Sears was the employee of R. M. Eyster, who at the time was doing business as/or under the trade name of Pittsburg-McAlester Coal Company. He was operating a coal mine under a contract with the McAlester-Edwards Coal Company, a corporation, owner of a coal mining lease granted by the mining trustees of the Choctaw and Chickasaw Nations. The mine operated by defendant Eyster was known as mine No. 4. The contract, among other things, provided that the McAlester-Edwards Coal Company would equip mine No. 4 with tipples, buildings, machinery, and equipment necessary to efficiently and economically operate the mine.

Eyster had operated the mine from January, 1926, until about April, 1928, at which time the development had extended to the point where it became necessary to install additional machinery and equipment. The installation of the additional machinery, etc., was commenced by the defendant McAlester-Edwards Company about April, 1928, and consisted of new engines, boilers, and a new engine house. The work was done by defendant Eyster as agent or employee of the coal company. The boilers were connected with the new engine by an eight-inch steam line running from the boilers to the engine under the floor of the engine room. This steam line was designed and intended to convey the steam from the boilers to the engine under a working pressure of 125 pounds per square inch. The joints of pipe making up the steam line were joined together by eight-inch flanges. One of these flanges was at a connection near the throttle of the engine and under the floor of the

engine room. This flange was manufactured by defendant Crane Company and sold by it to the McAlester-Edwards Coal Company. Just above the flange there was a trap door in the floor of the engine room. The work was completed in the latter days of October, 1928. The new engines were connected up with the hoisting machinery and made ready for use for the first time on the morning of November 1, 1928. Deceased, L. C. Sears, was employed as night fireman, and on the morning of November 1st, after he had gone off duty and while about to leave the plant, he was in the engine room near the trapdoor, at which time, a full head of steam being in the new line, the flange connecting the steam line at or near the throttle of the engine burst or broke into four pieces releasing the live steam, which blew the trapdoor open. The steam rushing through the trapdoor burned Sears; his death ensued.

This action was thereafter commenced by Nellie Sears against Crane Company, a corporation, McAlester-Edwards Coal Company, a corporation, and R. M. Eyster, doing business under the trade name of Pittsburg-McAlester Coal Company, to recover damages for his death.

It was alleged that the death was caused by the concurring negligence of defendants and each of them. The negligence alleged against defendant Crane Company was, in substance, that said company knowing the purpose for which the flange was purchased and intended to be used, said company sold and furnished the flange, knowing same to be defective, porous, honey-combed and permeated with blow holes and sand holes; that it carelessly and negligently made, cast, constructed, manufactured, furnished, and sold said flange; that it was carelessly and negligently manufactured of poor, defective, and inferior material, and in an inefficient and unworkmanlike manner, so that when made, cast, constructed, manufactured, and sold, it was porous, honey-combed, and contained blow holes and sand holes which made it weakened, defective, inefficient, and wholly unfit for the purpose for which it was to be used, all of which Crane Company well knew or could have discovered by the use of ordinary care and prudence; that the defects were patent and visible to the eye, and that the Crane Company was careless and negligent, and did not exercise ordinary care and prudence by failing to properly inspect said flange.

As to the other defendants, it was alleged that they were guilty of negligence in failing to furnish deceased with a reasonably safe place in which to work and reasonably safe tools and appliances with which to work; that they were guilty of negligence in installing said flange in its defective and weakened condition, and in failure to use ordinary care in the inspection of said flange before installing same.

It was also alleged that said defendants, other than Crane Company, were guilty of negligence in not properly constructing said steam line in that they failed to provide proper and necessary anchorage, failed to install necessary expansive joints, and that they were guilty of negligence in the operation of said plant in that they turned the steam into said line while it contained water so as to produce what was termed a "water hammer" by forcing the water in the line against said flange with such force and violence as to cause it to burst.

The petition as amended was attacked by defendants by separate general demurrers, and by defendant Crane Company by special motion to dismiss as against it because no cause of action was pleaded against it.

The demurrers and motion being overruled, defendants answered separately.

Defendant Crane Company answered by general denial; alleged contributory negligence; that at the time of the accident the relation of master and servant did not exist, and that deceased was a trespasser; that deceased had assumed the risk; that deceased was at the time acting entirely without the scope of his employment; that the injuries received by deceased were not received in the course of and did not grow out of his employment; that there was never any contractual relation between Crane Company and its codefendant, R. M. Eyster, and that no contractual relation between it and deceased existed, and that it owed deceased no duty whatever.

Defendant McAlester-Edwards Coal Company answered by general and specific denial. Denied that it was in any way engaged in the operation of said mine, or that it was acting as agent or representative of R. M. Eyster. It alleged that no contractual relation existed between it and deceased, and alleged that it owed him no duty whatever; that the injury did not occur while deceased was acting within the scope of his employment, but occurred after his employment had ceased and while he was in a place where he had no right to

be; that deceased was guilty of contributory negligence; that deceased was at the time of the injury in the engine room in violation of a rule of his employer; pleaded assumption of risk.

Defendant Eyster answered admitting that he was at the time operating said mine under the trade name of Pittsburg-McAlester Coal Company, and that deceased was employed by him at said mine as night fireman. In other respects his answer was substantially the same as that of defendant McAlester-Edwards Coal Company.

All the defendants pleaded that the flange in question was made of proper material in a proper manner, and, if it was in fact defective, the defects were hidden and could not have been discovered or ascertained by the use of reasonable and ordinary care and were not discoverable by the use of tests which were practical and could be reasonably made before the flange was used.

Reply to all answers was made by general denial.

The cause was tried to a jury, resulting in a verdict against all the defendants in the sum of $5,000.

As to defendant Crane Company, the jury answered two special interrogatories submitted to it by the court at the request of defendant Crane Company, which interrogatories and answers are:

"Interrogatory No. 1: Do you find from the testimony that Crane Co. used ordinary care in making inspections of the 8 by 13½ inch cast iron flanges? Answer: No.
"L. B. Howell, Foreman.

"Interrogatory No. 2: Do you find and believe from the testimony that the defendant Crane Co. used ordinary care in the manufacture of the flange? Answer: No.
"L. B. Howell, Foreman."

Judgment was entered accordingly, and defendants appeal.

The only alleged acts of negligence, as against defendants McAlester-Edwards Coal Company and Eyster, submitted to the jury were that defendants used a defective flange, the defects of which were known or could have been known by defendants by the use of ordinary care, and failure to use ordinary care in inspecting the flange before it was installed.

Defendants McAlester-Edwards Coal Company and R. M. Eyster present a joint brief. It is first contended by them that the court erred in overruling the demurrer of defend-

ant McAlester-Edwards Coal Company to the evidence, and in refusing to direct a verdict for said defendant, and in instructing the jury in effect that the uncontradicted evidence showed that said defendant was the owner of the mine, but was not operating it, but that it undertook to and did install the steam line and this flange therein which burst, and that it was its duty in constructing it to use reasonable care in inspecting and testing the flange, and that defendant Eyster acted as agent for the McAlester-Edwards Coal Company in installing the flange, and that in case the jury should find defendant Eyster liable to plaintiff it should also find defendant McAlester-Edwards Coal Company equally liable, and if defendant Eyster was not found to be liable, the jury should also find the McAlester-Edwards Coal Company not liable.

This contention is based upon the general rule that a landlord, who, without covenanting to repair and without knowledge of latent defects, puts a tenant in full possession and control of leased premises not intended for public purposes, and which are free from defects of construction constituting a nuisance, will not be liable for personal injuries sustained on the premises by reason of the defective condition thereof, by the tenant, members of his family, employees, guests or invitees or others entering upon the premises under the tenant's title, or, stated in other words, the landlord is liable only (1) where there is a covenant to repair; (2) where he had knowledge of latent defects; (3) where the premises were intended for public purposes: (4) where such defects of construction constitute a nuisance.

The rule is cited from 36 C. J. 204, par. 874.

A number of cases, including Lauder et al. v. Hornbeck, 74 Okla. 239, 179 P. 21, are cited in support of the rule.

Plaintiff contends that the position of defendant coal company in this appeal is a complete change of theory from that upon which it defended in the trial court. She asserts that the defense of the coal company and Eyster in the trial court was that the defects in the flange, if any, were not visible or capable of detection by the use of ordinary care in inspection, and that they used ordinary care and were therefore not liable, and the question of the relation of landlord and tenant between the coal com-

pany and defendant Eyster was not relied upon.

The plaintiff is in a measure sustained in this contention by the record, as appears from paragraph or count 6 of the answer of defendant McAlester-Edwards Coal Company, and the opening statement by counsel for said defendants.

But aside from that question, the record in this case is not such as to make the rule cited applicable.

The record disclosed that defendant Eyster had been operating the mine in question under an oral contract or agreement with the coal company from January, 1929, until after this action was commenced. At the trial a contract in writing was introduced. But it appears, and is conceded, that the written instrument was not executed nor even prepared until after this action was commenced in August, 1929. However, the evidence is that the written agreement contained all the provisions of the oral agreement under which the mine had been worked, and under which the repairs or improvements, including the installation of the steam line, were made. It is admitted that the additional equipment under the contract and agreement was to be placed there by the McAlester-Edwards Coal Company. Clause 2 of the written contract is pointed to as requiring the coal company to make the repairs, or improvements, whichever they may be called.

The McAlester-Edwards Coal Company, if its position be purely that of landlord, is not "without covenanting to repair." It admits it was its duty under the contract to construct the improvements or repairs. Its agreement amounted to a covenant so to do.

Where a landlord undertakes to make repairs, he is liable for injuries resulting from the negligence of himself or his servants in making such repairs. 36 C. J. 218; Upham v. Head, 74 Kan. 17, 85 P. 1017; Ruff Drug Co. v. Western Iowa Co., 191 Iowa, 1035, 15 A. L. R. 962.

"This liability of the landlord in such cases is not limited to the tenant personally, but includes all persons who, within the contemplation of the parties, were to use the premises under the lease. * * * The same rule applies to the negligence of the landlord in making of improvements, and he will be liable for any injuries resulting from the unsafe condition of the premises, after the making of same." 36 C. J. 217-18.

"The general rule is, likewise, that, where the landlord is under no obligation to make repairs, but undertakes to make them gratuitously, he will be liable for his negligence in making such repairs." 36 C. J. 218, par. 901; citing Horton v. Early, 39 Okla. 99, 134 P. 436.

Therein it is said that:

"Notwithstanding the plaintiff (landlord) was not legally bound to repair the roof, yet, having undertaken so to do, he is liable for the damage sustained on account of a failure to make said repairs in a proper and skillful manner. * * * He may be held responsible for his negligence or lack of care and skill, or the negligence of his servants, or those employed by him in doing what, in the first instance, he was not bound to do."

Furthermore:

"A landlord who undertakes to repair defects existing upon the property, and employs and directs another to do the work, is chargeable with knowledge of the manner in which the work is done, and is also chargeable with knowledge of defects in the premises of which his agent had knowledge." 36 C. J. 222.

The defendant coal company asserts that there was reversible error in certain instructions given by the court and in refusing certain instructions offered.

A careful examination of the record will disclose no substantial error in the instructions given and no error in refusing those offered.

It is next contended that the verdict and judgment are not reasonably sustained by the weight of the evidence.

This court will not weigh the evidence in a law action to determine where the weight thereof lies. If there be any competent evidence reasonably tending to support the verdict, this court will not set the verdict aside. We find evidence to support the verdict rendered.

Defendant Crane Company in its separate brief contends that it is not liable to plaintiff in any event, and asserts the rule, which it contends is well settled, to the effect that a manufacturer or seller of a defective article is not liable for injuries to persons in the employ of a vendee and with whom there is no contractual relation unless the article is inherently dangerous to life or property, or unless deceit or fraudulent concealment of the defect has been practiced by the manufacturer or seller.

There is nothing whatever to show that either Crane Company or the McAlester-Edwards Coal Company was guilty of fraud or deceit. Such a rule has been extensively

recognized and applied in a variety of cases. It appears first to have been announced and applied in Winterbottom v. Wright (Eng.) 10 Mees & W. 109. Negligence in the manufacture of an alleged defective wheel placed upon a coach to be used in transportation of the mail, whereby the driver of the coach was injured by the collapse of the defective wheel, was the basis of the · claim against the manufacturers of the coach.

The coach was made under a contract with the Postmaster General. There was no privity of contract between the manufacturer and the driver.

Recovery was denied solely upon the ground that there was no privity of contract between the parties. Distinction was made between the cases involving the manufacturer of inherently dangerous articles of commerce and negligence in the manufacture of articles not of themselves inherently dangerous. Fraud and deceit in covering known defects in manufactured articles not inherently dangerous was also distinguished. The rule thus announced has been extensively followed in courts of this country. Standard Oil Co. v. Murray, 119 Fed. 572; Bragan v. Perkins-Campbell Co., 87 Fed. 109; Laudeman v. Russell & Co. (Ind. App.) 91 N. E. 822; Heindirk v. Louisville Elev. Co. (Ky.) 92 S. W. 608; Lebourdais v. Vitrified Wheel Co. (Mass.) 80 N. E. 482; McCaffrey v. Mossberg & Granville Mfg. Co. (R. I.) 50 Atl. 651.

In many cases involving liability of a defendant to those with whom there was no privity of contract the cases are grouped in the three general classes: (1) Where the thing causing the injury was of a noxious or inherently dangerous kind; (2) where the defendant has been guilty of fraud or deceit in passing off the thing; and (3) where the defendant had been negligent only in some respects with reference to the sale or construction of a thing not imminently (inherently) dangerous. Generally it may be said that liability for negligence existed in the first and second classes, and that there was no such liability in the third class of cases.

In Huset v. J. I. Case Threshing Mach. Co., 120 Fed. 865, 61 L. R. A. 303. it was said that, at that time, February, 1903, the rule as to the third class of cases was nearly universal. Some 21 cases where the rule was followed were cited. It is also said that only the cases of Devlin v. Smith, 89 N. Y. 470, and Schubert v. J. R. Clark Co., 49 Minn. 331, 15 L. R. A. 818, were in con-

flict. The rule thereafter seems to have been generally followed down to 1915, when Cadillac Motor Car Co. v. Johnson, 221 Fed. 801, L. R. A. 1915E, 287, was decided by the United States Circuit Court of Appeals, Second Circuit. Therein it was held:

"That a manufacturer of automobiles ought to have discovered that a wheel purchased from another manufacturer was defective before placing it in a car does not render him liable to one who purchases the car from a dealer, for injury through collapse of the wheel, although his prospectus expressly states that the wheels used are the best obtainable."

A judgment for the plaintiff was therein reversed. Thereafter, and before second appeal in that case was decided, this court, in Ford Motor Co. v. Livesay, 61 Okla. 231, 160 P. 901, held:

"An automobile is not an inherently dangerous machine, and the rules of law applicable to dangerous instrumentalities do not apply."

And:

"The general rule, subject to certain exceptions not involved in this action, is that a manufacturer or vendor of an automobile is not liable to third parties who have no contractual relations with him for negligence in the construction, manufacture, or sale of such machine."

Cadillac Motor Car Co. v. Johnson, supra. was therein quoted from with approval. The exceptions to the rule mentioned were cases coming within the first and second classes noted above.

In March, 1916, McPherson v. Buick Motor Co., 217 N. Y. 382, was decided. Therein an additional exception to the general rule was announced.

It is in effect, that if the nature of a finished product placed upon the market by a manufacturer to be used without inspection by his customers is such that it is reasonably certain to place life and limb in peril if the product is negligently made, it is then a thing of danger. If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser and used without new tests, then, irrespective of contract, the manufacturer of this thing of danger is under duty to make it carefully. The principle is not limited to things which in their normal operations are implements of destruction, such as poisons, explosives, and other things of a like nature. Justice Cardozo. the author. reviews the decisions on the question some-

what at length. He acknowledged that Cadillac Motor Co. v. Johnson, supra, and a number of other cases, including the views expressed by Judge Sanborn in Huset v. J. I. Case Co., supra, were in conflict with his holding. In the opinion it is said:

"From this survey of the decisions there thus emerges a definition of the duty of a manufacturer which enables us to measure this defendant's liability. Beyond all question, the nature of an automobile gives warning of probable danger if its construction is defective. This automobile was designed to go 50 miles an hour. Unless its wheels were sound and strong, injury was almost certain. It was as much a thing of danger as a defective engine for a railroad. The defendant knew the danger. It knew also that the car woud be used by persons other than the buyer. This was apparent from its size; there were seats for three persons. It was apparent also from the fact that the buyer was a dealer in cars, who bought to resell. The maker of this car supplied it for the use of purchasers from the dealer just as plainly as the contractor in Devlin v. Smith supplied the scaffold for use by the servants of the owner. The dealer was indeed the one person of whom it might be said with some approach to certainty that by him the car would not be used. Yet the defendant would have us say that he was the one person whom it was under a legal duty to protect. The law does not lead us to so inconsequent a conclusion. Precedents drawn from the days of travel by stage coach do not fit the conditions of travel today. The principle that the danger must be imminent does not change, but the things subject to the principle do change. They are whatever the needs of life in a developing civilization require them to be."

The Cadillac Motor Company v. Johnson Case was again appealed to the Circuit Court of Appeals and decided in November, 1919, 261 Fed. 878, 8 A. L. R. 1023. There the court reversed its former holding and followed McPherson v. Buick Motor Co., supra. Therein it is said:

"We shall not consider at length the reasons which have satisfied us that a serious mistake was made in the first decision. The reasons may be found in the opinion in the Buick Case, to which we have already referred, and which render it unnecessary to traverse the ground anew."

In Heckel v. Ford Motor Co. (N. J. L.) 128 Atl. 242, 39 A. L. R. 989, decided in 1925, it is said:

"There was no error in either the refusal to nonsuit or direct a verdict. There was evidence from which the jury could find that the bursting of the tractor pulley was the proximate cause of respondent's injury. There was also evidence from which the jury could find that there was a defect in the pulley; that is, the darkened metal in the break indicating an old break, as against the bright metal, showing a new break. A contractual relation by appellant with respondent was not necessary to charge the former with responsibility.

"The manufacturer of an article not inherently dangerous but which may become dangerous when put to the use for which it is intended, owes to the public the duty of employing care, skill, and diligence in its manufacture, and of using reasonable diligence to see that it is reasonably fit for the purpose for which it was intended."

In Files v. Fox Bros. Buick Co. (Wis.) 218 N. W. 855, 60 A. L. R. 357, decided in 1928, the authorities on the question here involved are reviewed at length, and it is held:

"A manufacturer who places in trade and commerce a manufactured article not inherently, but because of its condition, imminently, dangerous to life and limb, is liable to one who sustains injury by reason of such condition."

There is quoted with approval the view expressed, though not adopted by the court, of Brett, M. R., afterwards Lord Esher, in Heaven v. Pender, L. R. 11 Q. B. Div. 503, 19 Eng. Rul. Cas. 81, as follows:

"Whenever one person supplies goods, or machinery, or the like, for the purpose of their being used by another person under such circumstances that every one of ordinary sense would, if he thought, recognize at once that unless he used ordinary care and skill with regard to the condition of the thing supplied, and who is to use it, a duty arises to use ordinary care and skill as to the condition or manner of supplying such thing."

The later, and as we think the better-reasoned, cases support the proposition that where a manufacturer, with information before him of the nature of the use to which an article manufactured by him is to be put, and from the very nature of things must know that if, when put to such use, if defective, it will be imminently dangerous to persons who he knows will come in contact therewith, a duty rests upon such manufacturer to use ordinary care to ascertain the condition of the article to see that it is safe. If he fails to exercise ordinary care in this regard, and as a result sells it in a defective condition, he is liable for personal injuries proximately resulting therefrom, to that class of persons who must necessarily come in contact with such article.

Such, in effect, was the rule applied by the trial court. The rule is, as we view the

law, the correct one. We must put aside the idea that in such circumstances the duty to guard life and limb grows out of contract and nothing else.

In this case there is evidence tending to show that Crane Company had knowledge of the nature of the use to which the flanges it sold, including the one that burst and caused the injury, would be put; that it had the plans of the power plant and the information that the flanges would be used in an eight-inch steam line running from the boiler to the engine, which would be called upon to convey steam under a pressure of 125 pounds per square inch. From the very nature of things it knew that when the power plant would be put in use, of necessity there must be attendants such as firemen and engineers who would daily come in close contact with the steam line.

Ford Motor Co. v. Livesay, supra, holds that an automobile is not an inherently dangerous machine, and that the rules of law applicable to dangerous instrumentalities do not apply. Justice Cardozo, in McPherson v. Buick Motor Co., supra, points out that "the principle that the danger must be imminent does not change, but the things subject to the principle do change. They are whatever the needs of life in a developing civilization require them to be."

We are not dealing with a case involving a defective automobile, and are not called upon to say whether or not under present conditions we would adhere to the rule announced in Ford Motor Co. v. Livesay, supra. We merely hold that the flange in question when put to the use for which it was designed and intended, if defective, became an imminently dangerous instrumentality, and comes within the exceptions referred to in the Livesay Case.

Other questions are raised as to the correctness of certain instructions given by the court, and alleged error in refusing others offered by defendant Crane Company. None of the instructions assailed are set out in full in the brief of defendant Crane Company, and plaintiff contends that the questions sought to be raised are therefore not properly presented. This may be true, but a careful examination of the entire record will disclose that, under the view we have taken of the law governing the principal question raised, there was no error in the instructions given, nor in the act of the trial court refusing instructions offered by defendant.

Judgment affirmed.

SWINDALL, McNEILL, BAYLESS, and WELCH, JJ., concur.