## SHELL PETROLEUM CORPORATION v. WILSON et al.

No. 24688. Sept. 17, 1935.

Rehearing Denied Dec. 8, 1936.

Joe T. Dickerson, Geo. W. Cunningham, Ralph G. Harder, C. W. Talbot, Stuart R. Carter, and John C. Quilty, for plaintiff in error.

J. M. Grubbs, for defendants in error.

BAYLESS, J. The plaintiff in error, Shell Petroleum Corporation, a corporation, a defendant below, appeals from a judgment, based upon the verdict of a jury in the district court of Payne county, Okla., against it and in favor of George A. Wilson et al., defendants in error herein, but plaintiffs below. Other parties were also defendants below, but need not be considered in the determination of this cause. The parties will be referred to as they appeared below.

The defendant states in its brief that the evidence upon the question of damages and the amount thereof is in conflict and there is sufficient evidence reasonably tending to support the verdict of the jury; and, therefore, it presents no error thereon. It limits its argument upon appeal to one general proposition: There is no legal liability on its part for any damages which the plaintiffs suffered under the facts shown in this case.

The following salient facts are undisputed:

(1) Defendant owned a quarter section of land adjacent to a quarter section of land owned by the plaintiffs.

(2) Defendant used its land as a tank farm and stored thereon oil produced by it and purchased by it elsewhere; and on the southwest 40 acres of the said land it had a large earthen tank into which it drained from the storage tanks a substance referred to in the record as "B. S. & W." This substance was described in the testimony as an emulsified substance composed of oil, sediment, water, and waste materials incident to the production and storage of crude oil. The evidence further established that this substance contained valuable elements which could be recovered by a chemical process and could be sold.

(3) That defendant accumulated about 80,000 barrels or more of this substance in this earthen tank.

(4) That on the 12th day of June, 1931, defendant entered into a written contract with General Oil Salvage Company, a copartnership, which will be referred to hereinafter as General, for the disposal of this substance. (We do not at this point determine whether the contract constituted a sale or created the relation of master and servant or principal and agent between the contracting parties.)

(5) General thereafter went upon the land and began treating this substance for the recovery of its commercial contents,

and continued these operations for about six months, when a fire occurred, resulting in the destruction of the substance, and during the progress of which fire said substance boiled over the confines of the earthen pit and ran across the land of the plaintiffs.

(6) The plaintiffs operated a farm and dairy upon their property and claimed that as a result of the substance running over their land certain damages resulted to them.

The plaintiffs state the controlling issues and contentions raised by the plaintiffs as follows:

"First. That the defendant, having accumulated and impounded this substance upon its premises in such large quantities and over such a long period of time in violation of the statute, it could not escape liability for damages which might result from the future handling of this substance even by absolute sale and delivery of the substance.

"Second. That the contract they made with Wright and Davis did not constitute a sale of any kind, but was simply an agreement to sell, and that the sale and delivery was not consummated until the substance was treated and reclaimed and paid for by the vendees, Wright and Davis; and that Wright and Davis, by virtue of the contract, were nothing more than agents or employees of the defendant in the reclaiming and removing of the substance from its premises."

The contentions of the defendant are contrary to these, of course, and its argument is divided into greater detail, but when it is finally considered, the contentions of the defendant are well comprehended within the two above quoted.

The negligence charged against the defendant, in the pleadings of the plaintiffs, falls into three classes: (1) The storage of the substance in violation of certain statutes; (2) the negligent acts of General, the alleged agent, servant or employee; and (3) the joint or combined acts of negligence of the defendant and General, its agent, servant, or employee.

The plaintiffs contend that defendant was guilty of violating section 7969, C. O. S. 1921 (sec. 11580, O. S. 1931), when it impounded and kept this large quantity of substance in its earthen tank; and thereby became guilty of negligence per se.

We do not agree with this contention. It is well settled by the opinions of this court that the section above quoted does not prohibit the storage upon land, the fee of which is owned by the operator, of such substances therein mentioned and herein involved. In discussing a similar contention in the case

of Tidal Oil Co. v. Pease, 153 Okla. 137, 231 P. 514, we said:

"To hold that operators could not * * * deposit same in pools or tanks on their own land, would in many cases render impossible development for oil and gas in fields where salt water is produced. It would result in depriving the owner of land of the right to use it to his own advantage where such use would in no way harm or injure others. It is only permitting oil or other inflammable products to escape into pools or tanks used for watering stock and located upon the lands of others or to flow into streams upon the premises of others, that the law is intended to prohibit. So with salt water. Subject to the rules of law with reference to due care, etc., the owner of land ought not to be prohibited from the full use and benefit thereof so long as he does not by such use injure or damage other persons."

We have heretofore had occasion to discuss whether the storage of gasoline, a highly inflammable refined product from crude oil, was a nuisance per se, and we held in Ferriman v. Turner, 99 Okla. 277, 227 P. 443, that it was not a nuisance per se unless the facts of the particular case were such as to make it so.

We are of the opinion that the storage of quantities of inflammable products or salt water from oil wells in proper receptacles generally and customarily used by the industry upon land owned by the owner of the product stored is not a nuisance per se, nor is it prohibited by law. Therefore, the first ground of negligence relied upon by the plaintiffs is untenable.

We next address our attention to the third ground—the joint negligence of defendant and General. We find in the plaintiffs' pleadings that they are charged with the failure to prevent the spread of the burning substance after it broke over the confines of the earthen tank, which it is asserted they had ample opportunity to do. We have read the evidence in the record and there is no evidence to sustain this contention. The plaintiff George A. Wilson only mentioned the fire and its progress once in his testimony, and then in this manner: "There was a fire took place very near the line west on the Shell property and during the night sometime that boiled over and ran down through that creek and shut up all my water supply." Therefore, plaintiffs can place no reliance upon this charge of negligence because of an absolute failure to establish it.

This brings us to the second charge of negligence—the acts of negligence of General, the alleged agent, servant, or employee of defendant. Both defendant and General

denied that in their pleadings and evidence, but plaintiffs allege that this denial is ineffectual in the face of their contract.

We have studied the various provisions of this contract in an effort to ascertain what was the intent of the parties thereto. We are of the opinion that this contract constituted a sale of this substance by the defendant to General. We have heretofore held in this opinion that the accumulation of this quantity of this substance was legitimate, and it must necessarily follow that defendant might dispose of it and completely dissociate itself therefrom. Since it did not own this substance at the time it burned and escaped, and since it has not been shown that defendant was in any wise liable for the fire or escape as a physical fact, it follows that there is no legal liability on the defendant upon the ground of ownership.

However, if we adopt the construction of the contract contended for by the plaintiffs and if we hold that the contract was not a sale but was merely a contract of employment or agency, the plaintiffs still cannot prevail.

It is clear from all of the testimony that no agent, servant, or employee of the defendant except General (conceding for the argument that General was defendant's agent) was at or near this substance when it burned and escaped, nor is it shown that any other agent, servant, or employee of the defendant in any wise participated in, or contributed to, the physical facts of the fire and escape. We have conceded for the argument the agency of General; but General was a party to this action and charged jointly with the defendant in the negligence which caused the damage to the plaintiffs, and yet the jury exonerated General from any responsibility or liability therefor.

It is a well-settled rule of law that where a plaintiff's cause of action is predicated on alleged acts of negligence of a servant, which in turn are attributable to the master under the rule of respondeat superior, and the servant is exonerated from blame, the employer is likewise exonerated. Consolidated Gas Utilities Co. v. Beatie, 167 Okla. 71, 27 P. (2d) 813, and the Oklahoma cases cited therein. ·

The judgment of the trial court is therefore reversed and the cause remanded to the trial court.

RILEY, BUSBY, WELCH, PHELPS, CORN, and GIBSON, JJ., concur. McNEILL, C. J., and OSBORN, V. C. J., dissent.

McNEILL, C. J. (dissenting). I am unable to concur in the conclusion which has been reached in the majority opinion by my associates. I do not believe that the opinion can rest in security under the rules of law which are announced therein.

It appears that the Shell Petroleum Corporation owned a large tank farm on which was located several large tanks, and it purchased oil from various producing companies. It maintained on this farm a large earthen tank in which it ran large quantities of refuse oil and bottom sediment, commonly known as "waste." The Shell entered into a contract with the General for the purpose of salvaging and refining this waste which had a commercial value. The Shell contends that under the contract it sold the waste oil and bottom sediment, and having surrendered possession and control, it relieved itself of resulting liability.

It is my view that it is immaterial under the facts in this case as to whether this waste was sold, or whether the question of master and servant, principal and agent, or joint owners was involved. The liability of the Shell is the same.

The substance of this waste material was regulated by the Legislature under the provisions of section 11580, O. S. 1931. That section is as follows:

"11580. **Disposition of Waste From Wells.** No inflammable product from any oil or gas well shall be permitted to run into any tank, pool or stream used for watering stock; and all waste of oil and refuse from tanks or wells shall be drained into proper receptacles at a safe distance from the tanks, wells or buildings, and be immediately burned or transported from the premises, and in no case shall it be permitted to flow over the land. Salt water shall not be allowed to flow over the surface of the land."

The Shell Company contends that this section does not apply to a tank farm or a refinery. The foregoing section of the statutes was adopted by the Legislature of 1909. See House Bill No. 238, article 2 of chapter 26, Session Laws of 1909. Section 11580, supra, was section 6 of said article with the exception that the word "negligently" in said section 6 was omitted therefrom when the Revised Laws of 1910 were adopted on March 3, 1911 (Session Laws 1910-11, c. 39, page 70). The title of that article is as follows:

"An Act to regulate the use and preservation of oil and gas and providing penalties for the violation thereof, providing for an inspector, his duties, compensation and appropriation therefor and declaring an emergency."

There is nothing in this title which limits the application of article 2 to oil and gas wells, but the act specifically attempts to regulate the use and preservation of oil and gas. Section 6 of said article is as follows:

"Section 6. No inflammable product from any oil or gas well shall be permitted to run into any tank, pool or stream used for watering stock; and all waste of oil and refuse from tanks or wells shall be drained into proper receptacles at a safe distance from the tanks, wells or buildings, and be immediately burned or transported from the premises, and in no case shall it be permitted to flow over the land. Salt water shall not be negligently allowed to flow over the surface of the land."

It is to be observed that the act extends beyond the drilling of oil and gas wells and relates to the storage, purchase, and use thereof. In the case at bar the General was engaged in the production and preparation of oil for use, and clearly comes within the terms of article 2 of chapter 26, Session Laws of 1909, and expressly section 6 thereof. It must be remembered that the burning oil was permitted to escape from the premises of the Shell and flow over and across the lands of plaintiff and thereby caused resulting injuries. Section 11580, supra, deals with three separate and complete prohibitions, to wit:

First: "No inflammable product from any oil or gas well shall be permitted to run into any tank, pool or stream used for watering stock."

Second: "and all waste of oil and refuse from tanks or wells shall be drained into proper receptacles at a safe distance from the tanks, wells or buildings, and be immediately burned or transported from the premises, and in no case shall it be permitted to flow over the land."

Third: "Salt water shall not be allowed to flow over the surface of the land."

Each of those provisions of the statute is mandatory and imposes a positive duty of observance upon those who are engaged in the business of dealing with oil and gas. When any person deals with waste of oil and refuse from oil wells, it becomes an enjoined duty, under the statute, to immediately burn or otherwise dispose of the substance when it accumulates on the surface of the ground, and in no case may it be permitted to flow over the land. In this case the Shell admits that it had the waste oil on its premises at the time it made the contract with the General. In the case of Comanche Drilling Co. v. Shamrock Oil & Gas Co., 122 Okla. 253, 254 P. 20, the oil company permitted oil to accumulate in a pond, and by reason of a flood the oil overflowed and damaged another's property, and the oil company pleaded, among other things, the act of God as a defense. This court held that the defendant could not escape liability. In that case the court quoted from the case of Brennan Construction Co. v. Cumberland et al. (D. C. App.) 15 L. R. A. (N. S.) 535. That case involved damages from a quantity of oil which escaped into the Potomac river and became ignited and damaged certain boats. This court, speaking through Mr. Justice Phelps, quoted the second paragraph of the syllabus, in the Brennan Construction Company Case, as follows:

" 'One who stores upon his premises near a navigable river large quantities of oil, the escape of which is bound to do the greatest amount of damage and injury to persons using the stream, is liable for the injury done in case of an escape of the oil, although it occurs without any negligence on his part.' "

In the body of the opinion there was also quoted the following statement:

" 'The remaining assignment of error is directed to the ruling that the defendant was liable whether guilty of negligence or not. Whilst the adjudged cases are not in harmony on this question, we have reached the conclusion that the rule followed by the court below was correct. * * * Many courts have held that a person who places some potentially dangerous substance upon his property—something which, if permitted to escape, is certain to injure others—must make good the damages occasioned by the escape of such substance regardless of the question of negligence.' "

The opinion further states:

"It is argued by defendant in error in the instant case that the statute above quoted has no application to crude oil stored upon the premises where it is produced, insisting that it applies rather to the refuse or waste where the oil is produced, but to our mind it would be unreasonable to impose a greater degree of care upon an oil producer to protect his neighbors against the refuse and waste from any oil well than he is required to exercise in protecting them from damages from the oil that is produced thereon. Counsel for defendant also argue in their briefs that the cases cited above do not support the contentions made in the instant case, and attempt to distinguish them. The opinions in those cases were not written upon the exact state of facts existing here, but a sufficient similarity exists to make the rules therein laid down reasonably applicable here, and these authorities, taken in connection with section 7969, Comp. Stat. 1921, supra, lead us to the conclusion that it is our duty to lay down the rule here that where the owner of premises impounds crude oil upon his premises and it escapes and results in injury and damage to his neighbor, under the circumstances and condition delineated in requested instruction No. 4, supra, the own-

er of the premises is liable in damages without regard to the negligence as inserted in such instruction." .

The majority opinion relieves the Shell Company from liability by virtue of the sale of the products under the contract. It seems questionable to me that there was an out and out sale. It seems more in the nature of an executory contract, for the transaction contemplates future dealing with the subject-matter by the seller to the buyer, and if such is the case, no title can pass until it is appropriated under the contract. See 23 R. C. L. 1347; 23 R. C. L. 170; Peterson v. Universal Automobile Insurance Co., 53 Idaho, 11, 20 P. (2d) 1016. And even though it be a sale, a party cannot erect a nuisance on his property and escape liability for damages resulting to another by conveyance of the property. 20 R. C. L. 392, para. 15.

In 46 C. J. 745, the following rule is announced:

"Vendor and Purchaser: One who erects a nuisance on his land cannot escape liability for damages caused thereby by a conveyance of the property. His liability may extend to a continuance of the nuisance subsequent to his conveyance, especially where he is shown to derive some benefit from its continuance, or where he sold with a warranty of the continued use of the property as enjoyed while the nuisance existed."

In the case of Karns et al. v. Allen et al., 115 N. W. 357, the Supreme Court of Wisconsin announced in the third paragraph of the syllabus the following rule:

"3. In an action to enjoin the maintenance of a dam as a nuisance and recover damages, where defendants A. maintained the dam for a time, and then sold it to defendant corporation, which continued the nuisance, they acting as officers of such corporation, defendants A. continued liable personally for the maintenance of the nuisance after the sale."

In the case of East Jersey Water Co. v. Bigelow (N. J.) 38 Atl. 631, it was said:

"One who erects a structure or construction which creates a nuisance, and then conveys to another his title, and the lands and premises on which the structure or construction exists and is maintained, with a covenant in the deed of conveyance for quiet enjoyment, and right to maintain such structure or construction, is liable for the continuance of the nuisance upon the ground that he affirms it, and must be regarded in law as continuing it. He is the author of the original wrong, and thus transferring the premises with the original wrong still existing, he is treated as affirming its continuance."

See, also, Wason v. Sanborn, 45 N. H. 169; Eastman v. Amoskeag Mfg. Co., 44 N. H. 143; Plumer v. Harper, 3 N. H. 88; Waggoner v. Jermaine, (N. Y.) 3 Denio, 306, 45 Am. Dec. 474; Brown v. St. Louis-San Francisco Ry. Co. (Mo. App.) 268 S. W. 678; Lohmiller v. The Indian Ford Water P. Co. (Wis.) 8 N. W. 601; Wilkerson v. Garrett et al. (Tex. Civ. App.) 229 S. W. 666; Central Consumers Co. v. Pinkert (Ky. App.) 92 S. W. 957; 16 A. & E. Ency. of Law, page 980; Woods, Law on Nuisances, 968; Ray v. Sellers, 1 Duv. (Ky.) 254; West v. L. C. & L. R. R. Co., 8 Bush (Ky.) 404.

In the case of Minnetonka Oil Co. v. Haviland et al., 55 Okla. 43, 155 P. 217, an action was commenced to recover damages for injuries to a peach orchard on the premises of a plaintiff resulting from the alleged negligence of a defendant in drilling an oil and gas well on said premises. The defendant sought to escape liability by reason of the fact that it had made an independent contract for the erection of the derrick at the place where the well was drilled and that it had made an independent contract to complete the well on the premises, and that by reason thereof said defendant had no supervision or right to exercise any authority over the means or methods employed in the drilling of the well, and that the well was not to be paid for until completed and turned over to the defendant. This court, on that question, said:

"We have examined the authorities cited in the brief of counsel for defendant in support of this proposition, and we have reached the conclusion that the authorities so cited are not applicable to the facts of this case. The case of Casement v. Brown, 148 U. S. 615, 13 Sup. Ct. 672, 37 L. Ed. 582, only determines the proposition that an action will lie against an independent contractor for his negligence in the performance of his contract, and does not determine whether or not an action would lie against the employer of the independent contractor. The other cases cited are actions against one employing an independent contractor in the doing of work, by persons having no contractual relation with the employer, and to whom the employer owed no legal or contractual duty. We think that while the rule is well settled that one who does work through the instrumentality of an independent contractor is not liable for damages caused by the negligent performance of such work by the independent contractor, to third persons, except where the work is inherently dangerous or unlawful, it is equally well settled that, where a person either by contract or by law owes an obligation to another, he cannot escape liability for negligence in the performance of such obligation by delegating the duty to an independent contractor. In the case at bar, by the terms of the oil and gas

lease, as subsequently modified, the defendant had agreed with plaintiffs to drill an oil well upon their premises. By reason of this contract, it was the duty of the defendant to drill this well without doing any unnecessary damage to the property of the plaintiffs. The plaintiffs stand in an entirely different relation to the defendant as to their rights and its duty in the premises from that of a third person who was a stranger to the contract under which the work was done. As the work the negligent performance of which occasioned damage to plaintiffs arose out of the contract between plaintiffs and defendant, the defendant is liable for the negligent performance of such work without regard to the means by which it undertook to perform the contract.

" 'One who is personally bound to perform a duty cannot relieve himself from the burden of such obligation by any contract which he may make for its performance by another person. Therefore the fact that he may have used the utmost care in selecting an agent to perform this duty, or that he has entered into a contract with any person by which the latter undertakes to perform the duty, is no excuse to the person upon whom the obligation originally rested, in case of failure of performance. His obligation is to do the thing, not merely to employ another to do it.' (Shearm. & Redf. Neg. (5th Ed.) sec. 14.)"

The court further quoted from the case of Sciolaro v. Asch, 198 N. Y. 81, 91 N. E. 264, 32 L. R. A. (N. S.) 948, as follows:

" 'The contract between the appellant and the National Steam & Operating Company did not relieve the former from the duty imposed upon him by the covenant of the lease between him and the plaintiff's employers. It was a duty which he could not delegate to another so as to relieve himself from the consequences of its nonperformance.' Yazoo & M. V. R. R. Co. v. Crawford (Miss.) 65 South. 462, L. R. A. 1915C, 250."

This court, in the Minnetonka Case, supra, announced in the third paragraph of the syllabus the following rule of law:

"3. A lessee under an oil and gas lease, who contracts with an independent contractor for the drilling of a well upon the leased premises, cannot thereby escape liability to the lessor for damage to the property of the lessor by the negligence of such independent contractor in drilling such well."

In the case of Crane Co. v. Sears, 168 Okla. 603, 35 P. (2d) 916, the McAlester Edwards Coal Company, the owners of a coal mine, leased the same to Eyster and agreed to install certain tipples, etc. A flange was manufactured by Crane Company which was furnished to the mine, and it was defective and broke and by reason thereof permitted steam to escape and injure a workman. In that case, speaking through Mr. Justice Riley, the court said:

"The later, and as we think the better-reasoned, cases support the proposition that where a manufacturer, with information before him of the nature of the use to which an article manufactured by him is to be put, and from the very nature of things must know that if, when put to such use, if defective, it will be imminently dangerous to persons who he knows will come in contact therewith, a duty rests upon such manufacturer to use ordinary care to ascertain the condition of the article to see that it is safe. If he fails to exercise ordinary care in this regard, and as a result sells it in a defective condition, he is liable for personal injuries proximately resulting therefrom, to that class of persons who must necessarily come in contact with such article."

In view of these authorities, it seems to me that the Shell Petroleum Corporation was bound by statutory duty not to permit the waste products to escape from its premises. It appears unsound to me to hold the Shell not liable when it clearly admits in its answer that on the day of entering into the contract with the General it did have on its premises and within its control large quantities of waste oil and bottom sediment. It was bound at all times to observe the mandatory requirements of the statute. The provisions of the statute were written into its contract with the General. Those provisions of the statute, being penal in their nature, must be strictly construed against the Shell. The Shell was required to immediately burn and dispose of the waste oil from its premises and prevent its escape upon the land of another, and the Shell could not contract away this nondelegable statutory duty so as to relieve itself from consequential injuries for failure of performance under the statute. The Shell was the owner of the premises from which the oil escaped and continued to permit the storage of the same after the contract had been entered into with the General. In the Shamrock Case, supra, this court specifically held that there was no difference between the escape of waste oil and crude oil.

In conclusion: The statute was violated. Damages resulted through no act of the plaintiffs. The Shell was the owner of the premises and brought this inflammable and waste product to rest on its premises, and while there it violated the positive provisions of the statute. It created the condition which resulted in plaintiffs' injuries. It continued to maintain the condition. The damages speak for themselves. The jury was properly instructed under the issues, and plaintiffs, in my opinion, should be compensated

for the damages which were incurred through the acts of both defendants.

For these reasons, I respectfully dissent.

Mr. Vice Chief Justice OSBORN joins in this dissent.