**Nellie Mae MARKER, Administratrix of the Estate of Donald Orvel Marker, Deceased, Appellant,**

v.

**UNIVERSAL OIL PRODUCTS COMPANY, a corporation, Appellee.**

**No. 5569.**

United States Court of Appeals
Tenth Circuit.

Dec. 3, 1957.

Jack B. Sellers, Drumright, Okl., and Thomas A. Wallace, Sapulpa, Okl. (Tom

Wallace, Sapulpa, Okl., was with them on the brief), for appellant.

R. D. Hudson, Tulsa, Okl. (Philip N. Landa and Chris L. Rhodes, Tulsa, Okl., were with him on the brief), for appellee.

Before MURRAH, PICKETT and LEWIS, Circuit Judges.

LEWIS, Circuit Judge.

Plaintiff-appellant is aggrieved by an order of the United States District Court for the Northern District of Oklahoma which directed a verdict against her claim of a cause of action arising under the Oklahoma wrongful death statute. Appellant is the administratrix of the estate of her husband, Donald Orvel Marker, who died by asphyxiation while engaged in the course of his employment with the Tidewater Associated Oil Company.[1] The facts upon which appellant would predicate legal responsibility for the tragedy upon the defendant Universal Oil Products Company, hereinafter Universal, are stipulated and determinative of whether or not a jury question was presented in the trial.

Prior to 1940, Universal developed and patented a petroleum refining process consisting of catalytic polymerization of more volatile petroleum hydro-carbons, and designed and engineered a refining apparatus known as a catalytic polymerization unit in which to utilize the patented process. On September 1, 1939, Universal licensed Tidewater to use the patented refining process at its refinery and furnished Tidewater with plans and specifications for the construction of the unit used in the process. Universal also furnished and sold to Tidewater for use in the process a catalyst combining phosphoric acid and diatomaceous earth in pellet form. The unit, constructed by Tidewater entirely in accord with the design furnished by Universal, consisted mainly of two vertical vessels or towers approximately 36 inches in inside diameter and approximately 26 feet in height,

with an 18-inch manhead at the top and a 16-inch manhead at the bottom. The vessel served as container for the catalyst and had no other openings or side manways. The catalyst deposited in the towers was effective for its purpose for about three to six months; after that length of time it was necessary to dump the used catalyst, frequently seen glowing and smoking when exposed to the air, and recharge the vessels.

Universal and Tidewater both had engineering personnel present at the Tidewater refinery in 1940 and 1941 during the placing of the unit in initial operation and during the times the vessels were first recharged. At those times these engineers observed the following steps taken in charging or recharging a vessel with catalyst: The vessel was allowed to cool, then both top and bottom manheads opened and the used catalyst dumped. Then, the vessel was cleaned, the lower manhead was closed and a 400-pound drum of crushed firebrick was deposited in the vessel, then the vessel filled with the recharge of cold new or used catalyst to a depth of approximately two feet below the butterfly baffles, located at a mid-point in the towers. A man was then lowered into the vessel to level the bottom bed and raise the baffles into horizontal position where they were fixed by pins inserted by a second man outside the vessel and the same procedure followed in placing the top bed of cold new or used catalyst in the vessel.

The catalyst pellets, new or used, when cold, may be used in the process and create no danger of any kind. Hot catalyst, new or used, when exposed to air creates, as any fuel, carbon monoxide and, when confined, can cause to accumulate gas in lethal quantities. Between 1941, when Universal participated in the initial recharging of the vessels, and June 27, 1955, Universal had no notice or knowledge that hot catalyst was ever used by Tidewater in the recharging process and there is no evidence that

1. Hereinafter Tidewater. This company is not a party to the action nor its statutory liability pertinent to the issues.

Tidewater ever did so use hot catalyst. However, on the latter date the vessel was recharged with hot, used catalyst; decedent was lowered into the vessel to perform the function contemplated by the recharging procedure and was asphyxiated by the deadly carbon monoxide gas. He had no warning or conscious knowledge of his peril.

█ From this agreed factual background appellant ascribes negligence to Universal upon two prongs of legal duty asserting violation of its duty to decedent in that (a) the towers were negligently designed and not reasonably safe to those who must necessarily work with them in the manner intended and (b) no warning was given decedent by Universal of the danger of entering a vessel in which hot catalyst had been placed.

When decedent's plight was discovered, great difficulty was experienced in extricating him from the vessel. From this fact appellant argues that Universal had created an inherently dangerous instrument, defectively designed, and suggests that the vessel could have been made safe by the installation of manways in the side of the vessel.

█ Oklahoma, in accord with other courts since MacPherson v. Buick Motor Company, 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696, has adopted the doctrine that where a manufacturer knows that an item manufactured by him will be imminently dangerous to persons using it in the manner which was intended by its construction, he owes a duty to all persons who may come in contact with it to see that it is safe. Crane Co. v. Sears, 168 Okl. 603, 35 P.2d 916. And it has been held that this doctrine applies with equal force to one whose unsafe design is the proximate cause of injury, Inman v. Binghamton Housing Authority, 1 A.D.2d 559, 152 N.Y.S.2d 79; Clemens v. Benzinger, 211 App.Div. 586, 207 N.Y.S. 539; cf. Sherman v. Miller Const. Co., 90 Ind. App. 462, 158 N.E. 255. But it must be noted that no structural or constructural defect is claimed to exist in the instant case. See Auten v. Livingston, 201 Okl. 467, 207 P.2d 256. Indeed, Universal did not build or service the unit nor was there a functional failure in its operation which could be attributed to Universal as its designer. Abstracted, appellant's claim is that the design could have included a safety feature in the form of side manways. Although the only evidence upon this contention produced by appellant indicates the suggestion of improvement in design to be not feasible, at least economically, the rule is well settled that neither designer nor manufacturer has a legal duty to adopt or produce a process or product incorporating only features representing the ultimate in safety. The rule is well stated in Day v. Barber-Colman Co., 10 Ill.App.2d 494, 135 N.E.2d 231, 238. where the court said:

"* * * And there was no obligation resting on the defendant manufacturer to adopt every possible new device which might possibly have been conceived or invented, if there were any; it is not of itself negligence to use a particular design or method in the manufacture or handling of a product or doing a job which is reasonably safe and in customary use in the industry, although other possible designs, whether in use in the industry or not, might be conceived which would be safer, and evidence as to what is thought by some to be a safer design or method or product is not admissible. American Malting Co. v. Lelivelt, 1902, 101 Ill.App. 320; Bohn v. Standard Laundry Co., 1909, 148 Ill.App. 494; Reddick v. General Chemical Co., 1905, 124 Ill.App. 31, Kennedy v. Chicago, etc., Coal Co., 1913, 180 Ill.App. 42. The fact that an accident was, conceivably, avoidable, and might, conceivably, have been prevented does not warrant a jury in finding that there was a fault or negligence by the defendant in not anticipating and providing against it."

See also Grammer v. Mid-Continent Petroleum Corp., 10 Cir., 71 F.2d 38.

There is no evidence that the Universal designed vessel was not standard in the industry nor that its design contained a latent functional defect. Contrary, fifteen years' use by Tidewater indicated no inherent danger to workmen when recharging the vessel with cold catalyst. The peril ensued only when hot catalyst was bedded, an occurrence not included in the vessel's design, nor necessary to its functional recharge.

Appellant must also fail in her first contention for another reason. The proximate cause of decedent's death was the inhalation of carbon monoxide, an odorless, colorless, tasteless and deadly gas. There is no evidence from which a jury could reasonably find that decedent would have been spared had the vessel provided escape through side manways. The jury could but speculate as to how long the deceased lived after exposure to the insidious gas and as to how long it would have taken to extricate the victim under differently designed conditions. Appellant did not meet the burden of proximate cause even if her legal basis of negligent design were capable of support.

We pass now to appellant's second claim: that Universal had a duty to warn decedent of the danger of entering the vessel when hot catalyst was in use.

■ The fact that the use of hot catalyst in the vessel during the process of recharging would create carbon monoxide gas and hence a dangerous condition for workmen lowered into the

vessel was equally within the technical knowledge of both Universal and Tidewater. No duty existed upon Universal to warn Tidewater of such a potentiality.[2] The consequent action of Tidewater in using hot catalyst constituted a gross misuse of the unit, contrary to the procedure witnessed and supervised by Universal in 1940 and presumably continued until 1955. While a designer or manufacturer may have a duty to warn of a latent limitation in even a perfectly made article, Tomao v. A. P. DeSanno & Son, Inc., 3 Cir., 209 F.2d 544, no such duty extends to the potential danger involved in the totally unanticipated misuse of an item. Walton v. Sherwin-Williams Co., 8 Cir., 191 F.2d 277; Yaun v. Allis-Chalmers Mfg. Co., 253 Wis. 558, 34 N.W.2d 853; Sawyer v. Pine Oil Sales Co. et al., 5 Cir., 155 F.2d 855. And see Jamieson v. Woodward & Lothrop, D.C.Cir., 247 F.2d 23, certiorari denied 78 S.Ct. 84, where a majority of that court held that a manufacturer had no duty to warn the user of the possibility of accident when a simple device was used *in accordance* with instructions furnished.

To avoid the obvious conclusion that arises that defendant, knowing that Tidewater knew of the danger of using hot catalyst and would not be expected to abuse that knowledge, owed no duty to warn Tidewater employees, plaintiff cites section 396 of the Restatement (1948 Supp.). That section, however, deals with the duty of the manufacturer to inspect, not abrogated by a similar duty on the part of a third person, and does not test the scope of the supplier's

2. The Restatement of the Law of Torts, sec. 388i:

"One who supplies a chattel to others to use for any purpose is under a duty to exercise reasonable care to inform them of its dangerous character in so far as it is known to him or of facts which to his knowledge make it likely to be dangerous, *if, but only if, he has no reason to expect those for whose use the chattel is supplied will discover its condition and realize the danger involved therein * * *.* However, the condition, although readily observa-

ble, may be one which only persons of special experience would realize to be dangerous. In such case if the supplier, having such special experience, knows that the condition involves danger and has no reason to believe that those who use it will have such special experience as will enable them to perceive the danger, he is required to inform them of the risk of which he himself knows and which he has no reason to suppose that they will realize." (Emphasis added.)

duty to warn of facts which make the item involved likely to be dangerous.

The duty to "exercise reasonable care" in supplying information regarding the creation is placed upon the supplier by Section 388 and if he has done so, he is not subject to liability, even though the information never reaches those for whose use the chattel is supplied. Under the circumstances of this case, it is beyond question that defendant owed to Tidewater no duty to instruct it as to fundamental formulae and the possibility of danger in the misuse of the polymerization unit and it had the right to rely upon Tidewater to protect its own employees from harm.

Plaintiff's arguments anent the duty of one supplying a "secret formula" are similarly without merit, for the burning of any material in that limited space would have created the gas and the catalytic agent's compound was not the proximate cause of this unfortunate death.

Affirmed.