Elzie Pauline ROURKE, Indv., etc.,
Appellant,

v.

Adolph O. GARZA et al., Appellees.

No. 16226.

Court of Civil Appeals of Texas,
Houston (1st Dist.).

May 9, 1974.

Rehearing Denied June 20, 1974.

Mills, Shirley, McMicken & Eckel, Preston Shirley, Galveston, for appellant.

Kronzer, Abraham & Watkins, W. James Kronzer, John B. Murphrey, Nick C. Nichols, Houston, R. A. Apffel, Galveston, for appellee Adolph O. Garza.

McLeod, Alexander, Powel & Apffel; V. W. McLeod, James L. Anthony, Galveston, for appellee Har-Con Engineering, Inc.

COLEMAN, Chief Justice.

This is a products liability case resulting from an industrial accident. Appellee, Adolph O. Garza, a pipefitter-welder employed by Har-Con Engineering Company, Inc., brought this suit against J. E. Rourke, Individually and d/b/a J. E. Rourke Rental & Supplies, for personal injuries sustained in a fall from scaffolding which had been supplied by Rourke to Har-Con at Har-Con's job site in Galveston, Texas. Rourke impleaded Har-Con, alleging written indemnity. The trial court entered judgment on the jury's verdict in favor of Garza against Rourke in the amount of $303,126.42, of which amount Travelers Insurance Company, the compensation carrier for Har-Con, was awarded $35,326.42. The trial court denied Rourke's plea of indemnity against Har-Con.

Appellee Garza charged that Rourke supplied "defective" scaffold boards to Har-Con's job site because the boards did not have cleat type devices attached to the boards to prevent their slipping on the pipe frames. These cleats are 2 x 4 boards, nailed to the underside on each end of the boards, which act as chocks to prevent longitudinal movement of the boards.

In May, 1965, Har-Con, a Houston based construction firm, was engaged in several construction jobs in Galveston, Texas, including the work at Sam Houston School where the accident occurred. Har-Con specialized in mechanical work such as plumbing, air conditioning, heating and ventilating. Rourke had been in the business of renting scaffolds and scaffolding materials for about fifteen years prior to the accident and had rented such equipment to Har-Con on a number of different occasions prior to this incident. Rourke would customarily deliver the scaffold pipe frames and boards and related equipment to the job site and Har-Con would then assemble it. On occasion Har-Con would move the scaffolding from one job site to another. On this particular occasion, Rourke's delivery man, Myer, delivered

and unloaded the scaffold pipe frames, boards and connecting pins at the job site at the Sam Houston School. Myer took the equipment off the truck, left it on the ground and called Har-Con's superintendent, Fred Newton, over to check the delivery. Newton counted the materials and signed a receipt for Myer which recited that the equipment had been delivered in good order. The scaffolding being used on this particular job consisted of steel pipe framing across which were laid 2 x 10 inch boards eight feet in length which formed the platform. The delivery receipt shows that four eight-foot 2 x 10 boards were delivered to the job site. Har-Con's foreman, Hawkins, and several other Har-Con employees actually assembled and erected the scaffolding.

Garza saw the scaffolding materials when they were delivered by Myer and while they were being erected by the Har-Con's employees but took no actual part in the unloading, checking or assembly of the scaffold. Garza climbed to the top of the scaffolding platform and had been working there about an hour and a half prior to the accident. Garza testified that immediately prior to the accident, he had finished making a weld and had stepped aside so that his fitter could scrape the weld; that he then fell when the scaffolding slipped. Garza's recollection was that two inside boards slipped and that he fell down into the center of the scaffolding.

Joe Rourke, who had started the rental business, died prior to the trial and his wife continued to manage the business after his death. The only other employee of the business was Myer, the delivery man, who had delivered scaffolds and the scaffolding materials for Rourke for about 15 years. Myer's testimony was that Rourke never used cleats on the boards and rented the boards as they were and if the customer wanted cleats the customer could put them on himself. He testified that if Rourke put cleats on there would be an extra charge but that Rourke never put them on. He said that he considered the cleats

"stumbling blocks" and that when boards were returned with cleats on them he just knocked them off with a hammer. He said Har-Con had never asked for cleats and that he did not recall ever having put any cleats on any boards. He said he had never had a board slip though he had never given it a thought as to whether they would slip; that no cleats had been put on the boards he delivered to the Har-Con site and that he delivered "just plain old boards" to lay across the pipe. He said he knew the boards and materials were going to be used for scaffolding and that sometime after the accident occurred he picked up the scaffolding, unassembled, from a different site than the Sam Houston School job and had never heard about Garza's accident until about three weeks before his deposition.

Har-Con's president, Harry Conley, testified that based on his expreience he thought that a scaffold board without cleats would be unsafe because the wood would shift on the scaffold and that he expected Rourke to supply boards reasonably fit for their use as scaffolding. He said it was customary for the boards to come with cleats and that without cleats they would not be reasonably fit for scaffolding boards and would be dangerous.

Fred Newton, Har-Con's superintendent, testified that sometimes some of the employees they used on jobs, particularly with respect to erecting scaffolding, were not so skilled in the work that they could put a scaffolding structure together satisfactorily. He said it was the custom in Galveston for suppliers to furnish cleats on the scaffolding boards and that he would depend on Rourke to give them boards with cleats and that his employees did not have the time to inspect the structure every time they climbed up and down the scaffolding. He said his pipe fitters usually assembled the scaffolding as they claimed it was their job to do so and that they had no personnel or equipment to put the cleats on the boards.

Another Har-Con employee, Lloyd Chris, Jr., testified that he believed he had helped put the scaffolding together and that he had looked at the boards after Garza had fallen. He said according to his recollection the board on the inside had no cleats on it and that two of the scaffolding boards had cleats and two did not.

The basic issues submitted and the jury's findings with respect to the question of Rourke's liability are as follows:

### SPECIAL ISSUE NO. 1.

"Do you find from a preponderance of the evidence that failure to have cleat type devices on the scaffold boards delivered by the Defendant, Rourke Rental, on May 27, 1965, rendered the scaffold boards defective as herein defined?

"You are instructed that a product is 'defective' as that term is used in the above Special Issue, if the product exposes its user to an unreasonable risk of harm when used for the purpose for which it was intended.

"By the term 'unreasonable risk of harm', as used in the above and foregoing instruction is meant that the article leased must be dangerous to an extent beyond that which would be contemplated by the ordinary user who leases it, with the ordinary knowledge common to the community as to its characteristics.

"ANSWER: 'We do'.

"If you have answered Special Issue No. 1 'We do', and only in that event, then answer:

### SPECIAL ISSUE NO. 2.

"Do you find from a preponderance of the evidence that Defendant ROURKE RENTAL could reasonably anticipate that the scaffold boards delivered on May 27, 1965, might be placed upon the scaffold frame without the addition of cleat type devices?

"ANSWER: 'We do'

"If you have answered Special Issue No. 1 'We do', and only in that event, then answer:

SPECIAL ISSUE NO. 3

"Do you find from a preponderance of the evidence that the failure to have cleat type devices on the scaffold boards was a producing cause of the occurrence in question?

"In connection with the foregoing Special Issue, you are instructed that the term 'producing cause' means an efficient, exciting, or contributing cause, which, in a natural sequence, produced injuries or damages complained of, if any. There can be more than one producing cause.

"ANSWER: 'We do'

SPECIAL ISSUE NO. 4

"Do you find from a preponderance of the evidence that Defendant ROURKE RENTAL'S failure to provide cleat type devices on the scaffolding boards in question constituted negligence as that term is herein defined?

"ANSWER: 'We do not' "

In nineteen consolidated points of error appellant Rourke asserts that at the time of delivery of the scaffolding boards, they were not defective; that the theory of strict liability is not applicable to the renting or leasing of equipment to a large industrial user; that the jury having failed to find negligence, there was no basis for strict liability; that the condition of the boards was open and obvious and the absence of cleats could not have constituted a latent defect; that the erection of the scaffolding by Har-Con's employees with knowledge of the absence of the cleats constituted an intervening cause negating strict liability; that any dangerous condition in connection with the boards arose solely from the actions of the Har-Con's employees in erecting the scaffolding; that the trial court erred in refusing appellant's requested special issues as to new and intervening cause, or as to sole cause as asserted with respect to Har-Con's employees; that the trial court erred in refusing appellant's requested special issues raising the question of the open and obvious condition of said boards; that the trial court erred in refusing appellant's issues inquiring as to the boards delivered in the condition not contemplated by Har-Con and by Garza; that the trial court had erred in not including in its definition of defective condition that the article must be dangerous to the extent not contemplated by Har-Con; that the trial court erred in overruling appellant's objections to the charge on producing cause; that the trial court erred in overruling its objections to the court's issues respecting the entity status of appellant; that the trial court erred in denying appellant's claim of indemnification against Har-Con and disregarding the jury's answers with respect to the apparent authority of its superintendent and related issues requested by appellant in connection therewith.

■ It is well settled in Texas that a manufacturer who places in commerce a product rendered dangerous to life or limb by reason of some defect is strictly liable in tort to one who sustains injury because of the defective condition. *Darryl v. Ford Motor Company,* 440 S.W.2d 630 (Tex. 1969).

■ The jury found that the scaffold boards were defective when delivered to Har-Con. It found that the defendant could reasonably anticipate that the scaffold boards might be used without change. It found that the failure to have cleat type devices on the scaffold boards was a producing cause of the injuries. These findings are sufficient to support recovery in this case on the theory of strict liability unless such theory is inapplicable under the facts of this case.

The scaffold boards were delivered by Rourke to Har-Con as unassembled components of a scaffold. The absence of cleats on some of the scaffold boards was readily apparent to the casual observer at the time of delivery. They were furnished by Rourke to be used as the floor of a scaffold. The supplier expected them to be used in the condition in which they were delivered, that is, without cleats. There is evidence that these boards were structurally defective for their intended use. The failure to incorporate safety features in the design rendered these "scaffold" boards unreasonably dangerous. The boards were not ready for use until installed on the scaffold. The evidence does not establish that at that time the absence of cleat type devices on the boards was readily apparent to the casual observer. There is no testimony that the plaintiff knew of the absence of such cleat type devices on the scaffold boards.

While there was a change in the completed product in the sense that it was assembled after delivery, it was such a change as was anticipated and contemplated by Rourke. As the 14th Court of Civil Appeals stated in Sharp v. Chrysler Corp., 432 S.W.2d 131 (1968, writ refused, n. r. e.):

> "The rule is that if the manufacturer or assembler surrenders possession and control of a product in which change will occur, or in which the change can be anticipated to occur so as to cause a product failure, the existence of a defect at the vital time is established . . ."

■ Since it is not disputed that Rourke delivered the equipment knowing the purpose for which it was to be used and anticipating that it would be erected just as it was, there was a defect at the "vital time". The "product" in this case is a scaffolding board. It was properly installed. As installed it presented an unreasonable risk of harm to the user. The evidence would support a finding that it was in a condition not contemplated by an average user. Under the evidence the average user of scaffolding boards would anticipate that cleat type devices would be utilized so as to prevent the slipping of the boards.

■ It appears that no Texas case has held that strict liability may be visited upon a supplier of a chattel under a lease arrangement rather than a sale. There can be little doubt remaining that Texas has embraced the concept of "strict liability" in its most comprehensive form. McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787 (Tex.Sup.1967), the landmark Texas decision embracing the principle of strict liability as proclaimed by the Restatement of Torts, Sec. 402a, clearly presaged the absence of a necessity for a literal sale in connection with this rapidly developing principle of tort liability. In Darryl v. Ford Motor Co., supra, the Supreme Court of Texas stated that "a manufacturer who places in commerce" an unreasonably dangerous defective product is liable to one injured by reason of the defect in the product. Thus the court made it clear that the protection of the doctrine is extended to non-users and non-consumers. There was no requirement that it be placed in commerce by sale rather than by lease. Where the transaction by which a product is transmitted into the stream of commerce is "essentially commercial" in character, liability can arise under Section 402a. McKisson v. Sales Affiliates, Inc., supra; Malinak v. Firestone Tire & Rubber Co., 436 S.W.2d 210 (Tex.Civ.App.—Houston, 1st, 1968, writ ref., n.r.e.); Freitas v. Twin City Fisherman's Cooperative Ass'n, 452 S.W.2d 931 (Tex.Civ.App.1970, writ ref., n.r.e.). There is a substantial body of authority holding that a product placed in the stream of commerce by a lease by one in the business of leasing such products must be held to the same strict liability in the case of a defective product unreasonably dangerous to the user as would be the seller of such a product. Cintrone v. Hertz Truck Leasing & Rental Service, 1965, 45 N.J. 434, 212 A.2d 769; W. E. Johnson Equipment Co., Inc. v. United

Airlines, Inc., 238 So.2d 98 (Sup.Fla.1970); Stang v. Hertz Corporation, 83 N.M. 730, 497 P.2d 732 (1972); Bachner, d/b/a Fairbanks Aircraft Service v. Pearson, 479 P. 2d 319 (Sup.Alaska 1970).

The jury failed to find that the defendant was negligent because of its failure to provide cleat type devices on the scaffolding boards. This finding, however, did not establish Rourke's freedom from neglect. The negative finding merely reflects that the party having the burden of persuasion did not satisfy the jury. City of Beaumont v. Graham, 441 S.W.2d 829 (Tex.1969); Enloe v. Barfield, 422 S.W.2d 905 (Tex. 1968). A claimant may prevail in a "design defect" case despite the fact that the manufacturer, assembler or distributor exercised all "possible care in the preparation and sale of its product." Sec. 402(a), Restatement of the Law of Contracts 2d. In Bexiga v. Havir Manufacturing Corporation, 60 N.J. 402, 290 A.2d 281 (1972), the Supreme Court of New Jersey stated:

> "Where a manufacturer places into the channels of trade a finished product which can be put to use and which should be provided with safety devices because without such it creates an unreasonable risk of harm, and where such safety devices can feasibly be installed by the manufacturer, the fact that he expects that someone else will install such devices should not immunize him. The public interest in assuming that safety devices are installed demands more from the manufacturer than to permit him to leave such a critical phase of his manufacturing process to the haphazard conduct of the ultimate purchaser."

Rourke contends that if the condition of the boards was patent or obvious, or was known to other Har-Con employees, "strict liability" cannot attach.

While the fact that the boards were not equipped with cleat type safety devices was open and obvious before their incorporation into the scaffold, it is not the law of Texas that a non-occupier of premises may rely upon the doctrine of open and obvious conditions to avoid a duty to exercise care to persons encountering the risk. Texas-Louisiana Power Co. v. Webster, 127 Tex. 126, 91 S.W.2d 302 (Tex.1936). It is not established that Garza knew of the absence of cleats from the boards. Special Issue No. 6 submitted this issue to the jury and the jury failed to find knowledge on his part. An affirmative finding on this issue was necessary to defeat Garza's cause of action whether Rourke relies on "open and obvious" conditions or volenti non fit injuria. Adam Dante Corp. v. Sharpe, 483 S. W.2d 452 (Tex.1972).

Rourke relies on the fact that the scaffold was erected by Har-Con employees other than Garza and that they knew that the scaffolding boards were not equipped with cleat type devices. Sec. 402(a) of the Restatement of Torts, Second Series, extends the obligation of the manufacturer of a defective product placed in the stream of commerce "to the ultimate user or consumer". Since it has not been established that Garza had actual knowledge of the danger presented by the scaffolding boards, the observation of the Supreme Court of Texas in Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S.W.2d 60 (1953), is pertinent:

> ". . . it is not the philosophy of the Adair case that one trip through a hall of dangers which are not open and obvious and easily perceptible to one having no occasion to look for them will relieve the owner of the premises of his duty to his guests to eliminate such dangers or to warn of their presence . . ."

In Shamrock Fuel & Oil Sales Co. v. Tunks, 416 S.W.2d 779 (Tex.1967), the court quoted from Comment (n), Contributory Negligence, Sec. 402(a), 2 Restatement of the Law of Torts (2d ed.), 356, as follows:

> "Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to dis-

cover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, nevertheless unreasonably proceeds to make use of the product and is injured by it, he is barred from recovery."

The Supreme Court went on to say that a plaintiff may be barred from recovery "when, after actual discovery of the dangerous propensities of an article or product, he persists in its use thus assumes the risk of injury by its continued use. This voluntary exposure to risk may not be the only type of action or failure to act that may bar a plaintiff's recovery . . ."

Certain conclusions with regard to the defenses available in an action based on strict products liability are found in the annotation, Strict Products Liability—Defenses, 46 A.L.R. 3d 240. We quote:

"Counsel will recognize that such terms as 'assumption of risk', 'product misuse', and 'negligence' are often used in a special sense in product liability cases. Thus the term 'assumption of risk' as used in Comment n to Restatement of Torts 2d, Sec. 402(a), refers to voluntarily and unreasonably proceeding to encounter a known danger, a type of conduct which may be more venturous than is normally presented in assumption of risk cases; . . . It would appear, for example, that there may be some cases wherein voluntarily proceeding to encounter a known danger would not be unreasonable, as where the nature of one's employment requires exposure to certain hazards. In such cases, it might be argued that recovery under strict liability in tort should be allowed either on the basis that the plaintiff's conduct was

not 'unreasonable', or perhaps even on the theory that it was not 'voluntary'."

 We find no cases in this annotation, nor in our research, nor have any cases been cited to us, in which knowledge of one other than the user has been imputed to the user as a basis for a finding of voluntary assumption of risk. It cannot be said that one voluntarily and unreasonably proceeds to encounter a known danger when the knowledge of the danger has been imputed to him by reason of the knowledge of a fellow employee. Furthermore, we cannot say as a matter of law that Har-Con or its employees knew and appreciated the danger presented by the scaffold equipped with scaffolding boards which had no safety devices designed to guard against slippage.

In Messick v. General Motors Corporation, 460 F.2d 485 (5th Cir. 1972), the court was of the opinion that Comment n of Sec. 402(a) of the Restatement of Torts, 2d ed., required the grafting of elements of contributory negligence to the doctrine of volenti. The court specifically approved the district court's instructions to the jury that the defense of voluntary assumption of risk as four essential elements: (1) that the plaintiff has knowledge of facts constituting a dangerous condition; (2) that he knows that condition is dangerous; (3) that he realizes and appreciates the nature or extent of the danger; and (4) that he voluntarily exposes himself to this danger. The court also instructed the jury, and such instruction was approved by the 5th Circuit, that a person is not at fault in voluntarily exposing himself to a known and appreciated danger if, under the same or similar circumstances, an ordinarily prudent person would have incurred the risk which such conduct involved.

 If knowledge of the danger should be imputed to Garza by reason of the doctrine of Delhi-Taylor Oil Corp. v. Henry, 416 S.W.2d 390 (Tex.1967), it would still be necessary to show that Garza voluntari-

ly and unreasonably exposed himself to that danger. While we doubt that the doctrine of Delhi-Taylor is applicable to situations other than occupier-owner negligence cases, we think that in the event it is applicable in this case, a jury question as to the reasonableness of Garza's use of the scaffold is presented, and the burden of securing a favorable finding was on the defendant. Adam Dante Corp. v. Sharpe, supra.

Appellant also complains that the trial court erred in refusing to submit these requested issues:

### SPECIAL ISSUE NO. 9.

"Do you find from a preponderance of the evidence that the boards, at the time of delivery, were in a condition not contemplated by Har-Con Engineering, Inc.?

"ANSWER 'We do' or 'We do not.' "

### SPECIAL ISSUE NO. 10.

"Do you find from a preponderance of the evidence that the boards, at the time of delivery, were in a condition not contemplated by Adolph O. Garza?

"ANSWER 'We do' or 'We do not.' "

■ We overrule this point. The issues were not in substantially correct wording as required by Rule 279, Texas Rules of Civil Procedure. Garza is the ultimate user and consumer, not Har-Con, and the test is whether Rourke's product was dangerous beyond that which would be contemplated by an ordinary consumer with ordinary knowledge common to the community, Maas v. Dreher, 10 Ariz.App. 520, 460 P.2d 191 (1969); or whether the product was unreasonably dangerous. Restatement of Torts (Second), § 402(a), Comments g, n.

Appellant further says that the trial court erred in overruling her objection to the court's definition of producing cause given with Special Issue No. 3. The issue and definition given were:

"Do you find from a preponderance of the evidence that the failure to have cleat type devices on the scaffold boards was a producing cause of the occurrence in question?

"In connection with the foregoing Special Issue, you are instructed that the term 'producing cause' means an efficient, exciting, or contributing cause, which, in a natural sequence, produced injuries or damages complained of, if any. There can be more than one producing cause.

"ANSWER: 'We do' or 'We do not.' "

Appellant alleges that the proper issue and definition concerned proximate cause rather than producing cause.

■ We overrule this point. Although there is authority to the contrary we hold that under Texas law in products liability actions based on alleged design defects or product failures, except in causes involving medicinal products, the plaintiff does not have the burden of showing that the defect or failure was a proximate cause of the occurrence in question, only that it was a producing cause. Burrus Feed Mills, Inc. v. Reeder, 391 S.W.2d 121 (Tex.Civ.App. 1965, no writ). See also Hartzell Propeller Co. v. Alexander, 485 S.W.2d 943 (Tex.Civ.App.1972, writ ref. n.r.e.), and Ford Motor Co. v. Russell & Smith Ford Co., 474 S.W.2d 549 (Tex.Civ.App.1972, writ dism.)

■ Producing cause is ordinarily defined as "an efficient, exciting or contributing cause, which in a natural and continuous sequence, in connection with any other cause or causes produced the event complained of. There can be more than one producing cause of an event." Hartzell Propeller Co. v. Alexander, supra. Appellant had complained that the instruction submitted by the trial court omitted the words "and continuous." There is no evidence of an event legally sufficient to break the continuity between the cause alleged by the plaintiff and injury sustained

by him. Under the facts of this case, error is not presented by this assignment.

We overrule appellant's next point complaining of the trial court's referring to decedent J. E. Rourke as "Defendant Rourke Rental" in Special Issue No. 2. It is uncontroverted that Mr. Rourke operated as Rourke Rental in the transaction in question and was so characterized without objection in Special Issue No. 1 and by appellant in her Special Issue No. 4. The error, if any, was harmless.

When the unassembled scaffold was delivered to the job site, Mr. Newton, the Har-Con construction superintendent, signed a delivery ticket. On the form above the signature line there is printed "Received the above in good order subject to terms and conditions on reverse side." On the reverse side under a heading "Terms and Conditions" are printed seven numbered paragraphs. Paragraph 2 provides:

"The Lessee shall at all times and at his own expense keep the leased equipment in good, safe and efficient working order, repair and condition and shall not permit anyone to injure, deface or remove it or any part thereof. Lessee agrees to erect, maintain and use said equipment in a safe and proper manner and in conformity with all laws and ordinances pertaining thereto and in accordance with Company safety rules and regulations. The Company shall have no responsibility, direction or control over *the manner of erection, maintenance, use or operation* of said equipment by the Lessee. The Lessee assumes all responsibility for claims asserted by any person whatever growing out of *the erection and maintenance, use or possession* of said equipment, and agrees to hold the Company harmless from all such claims. Lessee agrees that use of the leased equipment shall be construed as an absolute acknowledgment by Lessee that when delivered to Lessee by Company the equipment was is good order and repair, was properly erected and was in all respects adequate, sufficient and proper for the purpose for which it was intended." (Emphasis added)

Paragraph 7 provides:

"Failure on the part of the Lessors to strictly enforce any provision of this lease shall not be construed to be a waiver of the Lessor's right to subsequently require the strict enforcement of the same. In the event the Lessors are required to employ an attorney or attorneys to represent them in the collection of rent payable under the terms of this lease or to enforce any of the other provisions of this agreement, the Lessees agree to pay the Lessors all costs and expenses which they may incur hereby including reasonable attorney's fees which shall in no event be for a sum of less than Twenty-Five and No /100 Dollars ($25.00)."

In this case the trial court has entered a judgment against Rourke based on jury findings that Rourke furnished a defective product unreasonably dangerous to the potential users. The jury specifically refused to find that Rourke was negligent in furnishing this product. However the general rule that a contract of indemnity will not afford protection to the indemnitee against the consequences of his own negligence unless the contract clearly expresses such an obligation in unequivocal terms must be considered in determining whether this contract of indemnity will afford protection to Rourke.

In Fireman's Fund Ins. Co. v. Commercial Standard Ins. Co., 490 S.W.2d 818 (Tex.1973), the Supreme Court stated:

"We have, in fact, progressed toward the so-called 'express negligence' rule as near as is judicially possible without adopting it and thereby requiring in all cases that the parties state, in so many words, that they intend to save the indemnitee harmless from liability for his own negligence. In this connection, it should be clear from our opinion in

*McCann, supra,* including its discussion of the leading cases and modification of our opinion in Ohio Oil Co. v. Smith, 365 S.W.2d 621 (Tex.1963), that broad general statements of the indemnity obligation are not sufficient to protect an indemnitee against his own negligence, and that the only presently recognized exceptions are limited to (1) agreements in which one person clearly undertakes to indemnify another against liability for injuries or damages caused by defects in certain premises or resulting from the maintenance or operation of a specified instrumentality as in Mitchell's, Inc. v. Freedman, *supra,* and Houston & T. C. Ry. Co. v. Diamond Pressed Brick Co., 111 Tex. 18, 222 S.W. 204, 226 S.W. 140 (1920); (2) agreements which fall within the peculiar circumstances of the indemnitor having complete supervision over the property and employees of the indemnitee in connection with the performance of the indemnitor's contract as in Spence & Howe, supra; and (3) contracts in which there is an unequivocal provision that indemnitor will protect and indemnify the indemnitee from any and all liability by reason of injuries to indemnitor's employees as in Ohio Oil, supra."

Rourke contends that the provisions in the indemnity agreement under discussion clearly fall within exceptions (1) and (2) stated above. The contention is that the injury in this case resulted from the maintenance or operation of the scaffold. We cannot agree. The agreement did not clearly require Har-Con to indemnify Rourke against liability for injuries or damages caused by a defect in the scaffold. The injury did not result from faulty maintenance on the part of Har-Con. In paragraph 2 quoted above the company (referring to Rourke) disclaims any responsibility, direction or control over the manner of erection, maintenance, use or operation of the equipment by the lessee. Har-Con agrees to hold Rourke harmless from claims "growing out of the erection and maintenance, use or possession of said equipment." It appears that the intention of the parties to be drawn from the language used is that Har-Con should assume all responsibility for and liability for injuries resulting from operations and activities over which they have control. In a general sense the claim asserted by Garza grew out of the use of said equipment by Har-Con in connection with its job. Liability, however, is not based on the manner of use or on the possession of the equipment. An intention that Har-Con should indemnify Rourke only against liability for accidents caused by Har-Con's fault can reasonably be drawn from the language used. There is nothing in the wording of this clause that indicates specifically that Har-Con should indemnify Rourke for the results of Rourke's negligence. The agreement is completely silent as to defects in the leased equipment. Defects in the equipment were matters over which Rourke had sole control. It was the initial furnishing of defective equipment that forms the basis of the liability which Garza has imposed upon appellant under the judgment of the trial court. The agreement is not worded in such a manner as to give fair notice that Har-Con was assuming responsibility for claims arising out of the initial furnishing of defective equipment by Rourke.

The second exception cited by the Supreme Court in Fireman's Fund, supra, are agreements "which fall within the peculiar circumstances" of the indemnitor having complete supervision over the property and employees of the indemnitee in connection with the performance of the indemnitor's contract as in Spence & Howe." The facts of this case do not bring it within the "peculiar circumstances" of Spence & Howe Construction Co. v. Gulf Oil Corp., 365 S.W.2d 631 (Tex.1963). There the operation was performed on the premises of Gulf Oil Corporation and employees of Gulf Oil Corporation participated. Spence & Howe had complete supervision over the property and employees of Gulf

which were furnished for use in connection with the performance of the contract. The language of the indemnity contract was:

"In the performance of this contract you agree to assume liability for doing or failing to do anything that may result in death of or bodily injury to any person and loss of or damage to any property."

The liability of the Gulf Oil Company was predicated on the negligence of a Gulf employee operating equipment furnished by Gulf under the control of Spence & Howe while doing work required in the performance of the contract. The Supreme Court found that it clearly appeared that the contracting parties intended that the indemnitor should be held liable for damages resulting from the negligence of the indemnitee.

The question of indemnity in a products liability case was considered in K & S Oil Well Service, Inc. v. Cabot Corporation, Inc., 491 S.W.2d 733 (Tex.Civ.App.—Corpus Christi 1973, writ ref. n. r. e.). There a workman recovered damages against the manufacturer of a defective workover rig. The jury found defects in the rig which were the producing cause of the Workman's injuries. Judgment was entered against the manufacturer but it was given full indemnity against the purchaser.

The sale of the rig was made pursuant to a sales order form prepared by the manufacturer on two pages. The form used was very similar to the "delivery order form" with which we are concerned here. At the bottom of the second page of the purchase order there was a statement in ordinary, but slightly smaller type, which says: "Subject to the terms and conditions on the reverse side." The signature lines were directly beneath this statement. Under the heading "Terms and ˙Conditions" there appear six numbered paragraphs. Paragraph 4 reads:

" . . . Our liability being always limited to replacement of parts or

correction of defects free of charge. The foregoing warranty is in lieu of all other warranties or representations, expressed or implied. Component parts of our equipment manufactured by others are not warranted by us but carry any warranty of the manufacturer or supplier. We shall not be liable for indirect, special, general or consequential damages or injuries and you agree to indemnify us from any loss, injury or damage to third parties. No warranty, express or implied, is made on used equipment."

The Court of Civil Appeals stated:

"The rule that an indemnity agreement will not protect the indemnitee against the consequences of his own negligence unless the obligation is expressed in unequivocal terms, is to prevent injustice. Mitchell's, Inc. v. Friedman, 157 Tex. 424, 303 S.W.2d 775 (1957). A contracting party should be upon fair notice that under his agreement, and through no fault of his own, a large and ruinous award of damages may be assessed against him solely by reason of negligence attributable to the opposite contracting party. Joe Adams & Son v. McCann Construction Co., 475 S.W.2d 721 (Texas 1972). See also Perry v. Payne, 217 Pa. 252, 66 A. 553 (1907). We believe that in a sales order, 'fair notice' should also include conspicuousness of the indemnity agreement to prevest an obvious injustice . . . We hold that the indemnity provision in this 'sales order' was not conspicuous as a matter of law so as to import fair notice to the indemnitor. Compare 2.316 U.C. C. (b)."

The court also stated:

"Exculpatory or indemnity clauses which attempt to free an actor from liability for his own negligence are basically valid but must be strictly construed. The failure to state an attempted indemnity in plain unambiguous and clear terminology will result in an interpretation

that the clause was not intended to exempt the party from liability for his own negligence. Considering all of the provisions of the contract, we hold that the necessary clear and unequivocal language to indemnify the appellee Cabot against the consequence of its own negligence is not present."

In Price v. Shell Oil Company, 2 Cal.3d 245, 85 Cal.Rptr. 178, 466 P.2d 722 (1970), the court construed a provision in a lease contract reading:

"Lessee shall indemnify Shell against any and all claims and liability for injury or death of persons or damage to property caused by or happening in connection with the equipment or the condition, maintenance, possession, operation or use thereof."

The California court reaffirmed the rule that if an indemnitor is to be made responsible for the negligent acts of an indemnitee over whose conduct it has no control, the language imposing such liability should do so expressly and unequivocally so that the contracting party is advised in definite terms of the liability to which it is exposed. The court then stated:

"In the indemnity clause before us in the instant case, there is no language 'expressly and unequivocally' requiring Flying Tiger to indemnify Shell for liability or damages caused by Shell's own act in furnishing a defective tank truck nor its equipment. No language of such essential specificity indicates that the lessee is to be held responsible for the negligent acts of the lessor, much less for the strict liability in tort imposed upon the lessor for placing on the market a defective article. Indeed it would do violence to the doctrine of strict liability and thwart its basic purpose, if we were to interpret so general a clause as transferring the liability for a defective article from the party putting the article in the stream of commerce, to the user or consumer of the article who is within the class the doctrine was designed to protect."

An indemnity agreement in the same terms as the one under consideration here was considered by the appellate division of the Supreme Court of New York in Petersen v. Rand Construction Co., 24 A.D.2d 454, 260 N.Y.S.2d 203 (1965), and the court held that the alleged indemnity provision, viewed in the light of the purposes of the agreement and the pertinent facts and circumstances, fell short of manifesting a clear and unequivocal intent to protect Safeway against the consequences of its own negligence.

The trial court did not err in refusing to enter judgment on the indemnity agreement in favor of Rourke and against Har-Con.

■■■ This conclusion is reinforced by the fact that the indemnity provision appears on the back side of the contract which was signed by the employee of Har-Con. It was a "subject to" clause. It is well settled that the phrase "subject to" are words of limitation and do not create any affirmative contractual obligations. In S. T. McKnight Co. v. Central Hanover Bank & Trust Co., 120 F.2d 310 (8th Cir. 1941), the court stated:

"That the words 'subject to all the terms and conditions of said lease' do not impose contractual liability on an assignee to a lessor to carry out the covenants of a lease, seems to be the well supported rule. That they are words of qualification and not of contract appears to be well settled."

In Cockrell v. Texas Gulf Sulphur Co., 157 Tex. 10, 299 S.W.2d 672 (Tex.1956), the Supreme Court approved the following quotation from the case of Kokernot v. Caldwell, 231 S.W.2d 528 (Tex.Civ.App.—Dallas 1950, writ ref.):

"The term 'subject to' as used in the mineral deed has a well recognized meaning. 'The words "subject to," used in their ordinary sense, mean "subordinate to", "subservient to" or "limited by." There is nothing in the use of the words

"subject to," in their ordinary use, which would even hint at the creation of affirmative rights.' "

Aside from the phrase "Received the above in good order subject to terms and conditions on reverse side," the front page of the instrument under examination does not purport to be a contract and contains no contractual language. Nowhere in the instrument is it stated that there is a lease transaction nor does the instrument state the consideration to be paid for the use of the equipment. In the lefthand corner at the top of the page there is printed "If the Lessee fails to check the equipment he agrees to accept the lessor's count as final. Lost or broken equipment will be charged for at list. Failure of lessee to check his equipment in and out does not lessen his obligation for damage or shortage in accordance with our records. All rental will accumulate until we are notified it is ready to pick up."

The instrument has printed at the top "J. E. Rourke Rentals & Supplies, Post Office Box 989, Galveston, Texas. Order A 8829." It is directed to Har-Con & Company, mail address: 41– N School job. No signature by anyone representing J. E. Rourke appears on the instrument.

 Under these circumstances the indemnity provision appearing on the back side of the delivery order cannot be considered as conspicuous as to import fair notice to Har-Con of the existence of an indemnity agreement.

In appellant's comprehensive brief sixty one points of error are listed. Each of these points has been considered and is found not to present reversible error.

Affirmed.

EVANS, J., dissenting.

EVANS, Justice (dissenting).

It is my conviction that the facts of this case, as a matter of law, preclude recovery upon the theory of strict liability.

As stated in the majority opinion, the four scaffold boards were delivered as unassembled components of a scaffold and the absence of cleats on some of the boards was readily apparent to the casual observer at the time of delivery. Har-Con, an experienced, industrial user of scaffolding equipment, had leased such material in their unassembled state from Rourke on a number of prior occasions. Har-Con's superintendent on the job site, inspected the materials and signed Rourke's receipt indicating that the boards as delivered were in good condition. Certainly there was no concealed defect in the boards at time of their delivery. Since the absence of cleats could be readily ascertained by a casual observer at the time of the delivery of the four boards to Har-Con, can it be said that supplying the boards to Har-Con exposed the user to an unreasonable risk of harm?

" . . . the underlying basis for the conclusion so often reached by the courts that a product is defective and unreasonably dangerous is the ignorance of the user about the dangerous characteristics of the product. This necessarily means that a full and complete disclosure of a dangerous condition would have prevented a finding of defectiveness. Furthermore, if the maker or other purveyor of goods has no duty to guard against harm to users and those in the vicinity of use from a dangerous condition of a product that is open and obvious at the time of sale—a position sometimes taken by the courts concerning both negligence and strict liability theories—a product could never be regarded as unreasonably dangerous unless the danger was concealed to the casual user . . ." Keeton, 48 Tex.Law Review 398, p. 399.

When a potentially dangerous condition is obvious to the casual observer, there is generally no duty on the part of the supplier to warn of such condition. Hursch, American Law of Products Liability, Sec. 2:38, pp. 176–185.

" . . . It is not necessary for the supplier to inform those for whose use

the chattel is supplied of a condition which a mere casual looking over will disclose, unless the circumstances under which the chattel is supplied are such as to make it likely that even so casual an inspection will not be made." Restatement of Torts 2d, Sec. 388(b) k, p. 306.

The basis for this reasoning is summarized in Stevens v. Durbin-Durco, Inc., 377 S.W.2d 343 (Mo.Sup.1964), p. 347, in part quoting from the leading case of Campo v. Scofield, 301 N.Y. 468, 95 N.E.2d 802, 804:

> " 'Suffice it to note that, in cases dealing with a manufacturer's liability for injuries to remote users, the stress has always been upon the duty of guarding against *hidden* defects and of giving notice of *concealed* dangers.' The duty of the manufacturer in such case is satisfied by the manufacture of a product which is free of latent defects and concealed dangers . . . "

Somewhat analogous is Collum v. Pope & Talbot, Inc., 135 Cal.2d 653, 288 P.2d 75 (1955), in which two carpenters working on a construction job fell when a ceiling joist broke under their weight. The court in that case held against the plaintiffs and in favor of the lumber mill dealer and the lumber mill operator who had processed the joists and sold them to the dealer, stating:

> " . . . The mill operator put no foreign, deleterious substance into this joist. He inserted nothing into it at all. Nor did he combine or cover it with any other substance. He merely took sections of a tree, a product of nature, and cut them to size. When it came onto the market, and into the hands of the dealer, the building contractor, and the journeyman carpenter, its qualities continued visible, equally as visible and as readily discernible as when it left the view of the inspector who graded it as it came from the planer at the mill. Thus, plaintiffs were in as good a position to determine the utility of this lumber as was the inspector at the mill . . . "

See also Metal Window Products Company v. Magnusen, 485 S.W.2d 355 (Tex.Civ. App.-Houston, 14th 1972, writ ref. n. r. e.); Scott v. Liebman, 404 S.W.2d 288 (Tex.Sup.1966); Downey v. Moore's Time Saving Equipment, Inc., 432 F.2d 1088 (U.S.Ct.App., 7th Cir.); Murphy v. Eaton, Yale & Towne, 444 F.2d 317 (U.S. Ct.App., 6th Cir.); Inman v. Binghamton Housing Authority, 3 N.Y.2d 137, 164 N. Y.S.2d 699, 143 N.E.2d 895; Parker v. Heasler Plumbing & Heating Co., 388 P.2d 516 (Wyo.Sup.); Prosser on Torts, 4th ed., Sec. 96, p. 646, Sec. 104, p. 677; 86 A. L.R. 947.

The cases cited by appellees, notably Pike v. Frank G. Hough Co., 2 Cal.3d 465, 85 Cal.Rptr. 629, 467 P.2d 229 (1970), and Luque v. McLean, 8 Cal.3d 136, 501 P.2d 1163, 1170 (1972), suggest that where a product is highly dangerous and unsafe for its intended use, or where the question of apparency is one of fact, a recovery may be allowed even though the defect be considered "obvious." However, those cases do not suggest that recovery must be allowed where the obviousness of the danger is such that it must be concluded the product was not unreasonably dangerous to the user at time of delivery. See Luque v. McLean, supra, at p. 1169.

This is not a situation where a defect latent at the time of delivery was later discovered by the plaintiff who then continued to use the product after discovery of the defect. See for example Ford Motor Company v. Henderson, 500 S.W.2d 709 (Tex.App.-Beaumont 1973, writ granted); Messick v. General Motors Corp., 460 F.2d 485 (5th Cir. 1972). Nor is this a case where the product was unreasonably dangerous per se, as in Di Muro v. Masterson Trusafe Steel Scaffold Company, 193 Cal.2d 784, 14 Cal.Rptr. 551 (1961); see also Keeton, Products Liability, 48 Tex.Law Review 399.

> " . . . Many defective chattels can be used with complete safety by a person who is aware of the defect and guards

against the risk created by it. There is no legal duty not to sell a chattel which involves a risk of harm. The duty relates to the delivery of the chattel to one who does not know its actual condition, or though knowing it, does not understand the risk inherent in that condition. Consequently a seller who exercises reasonable care to acquaint the buyer of a chattel with facts known to the seller which bear upon the risk inherent in using the chattel, and to explain to the buyer the significance of such facts with respect to the risks of harm they create, does not have reason to know that the chattel is likely to be dangerous when used unless the seller realizes or should realize that the buyer by reason of youth, inexperience, or otherwise is incompetent to use the chattel safely, or is likely to turn the chattel over to a third person without warning him of the risk inherent in it. So too, where the seller reasonably believes that the buyer will discover for himself the condition of the chattel and realize the danger involved and to disclose it to any others who may be affected by it, the seller does not have reason to know that the chattel is likely to be dangerous when used." Restatement of Torts 2d, Sec. 401, p. 344.

Scaffolding boards such as those supplied by Rourke have long been utilized as a standard and common commodity in the construction industry. See Baker v. Stewart Sand & Material Company, 353 S.W.2d 108 (Mo.Ct.App.1961). It is a matter of common knowledge and experience, and requires no special engineering expertise, to recognize that a board with a flat surface will tend to slide more easily on its pipe supports than a board to which chocks or cleats have been attached to prevent slippage.

Since the industrial user, Har-Con, accepted delivery of the boards in their condition without cleats, I cannot conceive that reason would impose a duty on Rourke to issue independent warnings to each of Har-Con's employees as to such condition. See Restatement of Torts 2d, Sec. 388; Olszewski v. United Fruit Company, 34 F.Supp. 113 (Dist.Ct.Pa.1940); Youtz v. Thompson Tire Co., 46 Cal.2d 672, 116 P.2d 636 (1941).

A different situation might have been presented had Rourke undertaken the actual assembly of the scaffolding. See Restatement of Torts 2d, Sec. 391, p. 319. However, Rourke merely delivered the unassembled parts of the scaffolding which, after being inspected, accepted and receipted for by Har-Con's superintendent, were assembled by Har-Con's own employees. There was no delivery of a completed product, only the very basic elements of a structure of most simple design. If any of the four boards had been determined unsatisfactory for the work contemplated, Har-Con could have refused to accept delivery. See Blankenship v. St. Joseph Fuel Oil & Mfg. Co., 360 Mo. 1171, 232 S.W.2d 954 (1950).

A supplier's duty to exercise reasonable care does not, of course, make him an insurer. Frumer & Friedman, Products Liability, Sec. 6:04, p. 101. He is under no duty to design or construct a "fool proof" product, and if the danger to be avoided is apparent to the casual observer, he should not be held liable for failure to design a product which is "safer" than some other model. Marker v. Universal Oil Products Co., 250 F.2d 603 (U.S.Ct.App., 10th Cir., 1957); Neusus v. Sponholtz, 369 F.2d 259 (U.S.Ct.App., 7th Cir. 1966); Blankenship v. Morrison Machine Co., 255 Md. 241, 257 A.2d 430 (1969). See also Sarnoff v. Charles Schad, Inc., 50 Misc.2d 418, 270 N.Y.S.2d 763 (1966), citing Campo v. Scofield, supra, and Jones v. Klachkin, 22 Misc.2d 631, 199 N.Y.S.2d 155, aff'd without opinion 13 A.D.2d 911, 217 N.Y.S.2d 1020, wherein it is said 199 N.Y.S.2d at page 156:

" . . . There is no liability for renting a machine which is patently dangerous (Campo v. Scofield, 301 N.Y.

468, 95 N.E.2d 802). It is only if the danger lies in some imperfection of manufacture causing it to act in some unusual way which causes injury that liability can be invoked. But there is no liability where the claimed defect is that by a change in design or the addition of safety devices a safer machine could have been produced."

At any time from point of delivery to completion of the assembly process, Har-Con's employees had opportunity to either reject or correct any obviously defective materials or to warn other employees of the existence of such defects. Under the circumstances of this case, I believe it became Har-Con's duty, not Rourke's, to warn its employees of the condition of the scaffold boards, i. e., the absence of cleats.

" . . Modern life would be intolerable unless one were permitted to rely to a certain extent on others' doing what they normally do, particularly if it is their duty to do so . . ." Restatement of Torts 2d, Sec. 388, p. 308.

Since the condition of the scaffolding boards was clearly obvious to any casual observer at the time of their delivery by the supplier Rourke to the industrial user Har-Con, I am of the opinion that such boards could not, as a matter of law, be regarded as unreasonably dangerous, and that Rourke was under no duty to warn Garza, the employee of the industrial user, about the condition of such boards. See Younger v. Dow Corning Corporation, 202 Kan. 674, 451 P.2d 177 (1969); Downey v. Moore's Time Saving Equipment, Inc., supra; Marker v. Universal Oil Products Co., 250 F.2d 603 (U.S.Ct.App., 10th Cir., 1957); Frumer & Friedman, Products Liability, Sec. 8:04; Littlehale v. du Pont, 268 F.Supp. 791, aff'd 380 F.2d 274.

The jury failed to find that Rourke was guilty of negligence in supplying the boards without cleats and I cannot agree with the majority that appellees' recovery may be upheld upon the theory of strict liability.