Donald C. NEUSUS, Plaintiff-Appellant,

v.

B. D. SPONHOLTZ d/b/a De-Lux Neon Manufacturing Company of Oklahoma City and American Fire Apparatus Co., a Michigan corporation, Defendants-Appellees.

No. 15264.

United States Court of Appeals Seventh Circuit.

Aug. 11, 1966.

Rehearing Denied Sept. 27, 1966..

John C. Mullen, James P. Chapman, Chicago, Ill., for appellant.

Louis Gershon, Horace W. Jordan, Frederick W. Temple, Chicago, Ill., Van Duzer, Gershon & Jordan, Chicago, Ill., of counsel, for defendant-appellee, B. D. Sponholtz, etc.

Alvin G. Hubbard, Reese Hubbard, Frederick W. Temple, Chicago, Ill., Hubbard, Hubbard, O'Brien & Hall, Chicago,

Ill., of counsel, for American Fire Apparatus Co.

Before CASTLE, KILEY, and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

This action was brought by Donald C. Neusus against B. D. Sponholtz, doing business as De-Lux Neon Manufacturing Company of Oklahoma City, Oklahoma and the American Fire Apparatus Company, a Michigan corporation.[1] The plaintiff sought damages for injuries suffered when a fire truck aerial ladder which he was ascending suddenly collapsed while being used to fight a fire. The ladder was designed and assembled by the defendant Sponholtz who sold it to the defendant American Fire Apparatus Company. American installed the ladder on a pumping engine truck which it sold to the plaintiff's employer, the City of Batavia, Illinois. The complaint charged Sponholtz with negligence in the design and construction of the ladder and with the breach of express and implied warranties of quality. American was charged with negligence in installing the ladder on the truck and in failing to make sufficient safety tests and with the breach of an implied warranty of quality.

■ The jury returned verdicts for the defendants and the judgment was entered from which this appeal is taken. The errors relied upon arise out of assertedly prejudicial cross-examination of certain witnesses for the plaintiff, rulings on evidence, instructions, and remarks by the district judge during the trial. We do not reach these issues, however, because we are convinced that the plaintiff was guilty of misuse of the ladder and contributory negligence as a matter of law and that therefore the defendants were entitled to a directed verdict.[2]

1. The suit was commenced in the Circuit Court of Kane County, Illinois and removed to the federal district court on the basis of diversity of citizenship.

2. Although we do not reach these questions, the objectionable trial tactics of defense counsel for American, Reese Hubbard, should not escape comment. His

conduct was very unprofessional in several instances, particularly with respect to his method of cross-examination by unsupported innuendo, and were it not for our resolution of the principal issue a new trial would have to be granted to the plaintiff. One example is sufficient to illustrate this point. During his cross-

A summary of the relevant evidence follows.

Sponholtz purchased a heavy duty extension ladder from the Aluminum Ladder Company in 1951. The ladder was a "ground ladder," which means that it was designed for use with its base on the ground and its top resting against a building or other fixed object. Sponholtz modified the ladder so that it might be used as a partially mechanized aerial ladder on a fire truck, and sold it to American in February 1952. American mounted the ladder on a fire truck and delivered the entire unit to the Batavia Fire Department in May 1952.

The ladder designed and assembled by Sponholtz was a three section aluminum extension ladder, affixed to a steel bed mounted on a pedestal. The ladder struc-

examination of an expert witness for the plaintiff, attorney Hubbard asked whether it was not true that the witness spent nearly all of his time testifying or "getting ready to testify," and whether he had not in fact just recently testified in a "Willie Bishop" case. The witness denied the facts suggested by these questions and counsel offered no proof by way of impeachment to support them. (In oral argument before this court, counsel for American—not trial counsel—attempted to justify the questions by representing that American's trial counsel had received a hearsay report of the expert witness' testimony in a "Willie Bishop" case. This representation was, of course, neither reassuring nor in any way exculpatory.)

The cross-examination tactic of attorney Hubbard is particularly objectionable in this case because it appears to have been undertaken deliberately and with complete disregard of the consequences. The same counsel has been criticized on a number of occasions for the same tactic and other tactics which are questionable from the standpoint of professional ethics. This court criticized counsel just one year ago for his deliberate disobedience of a trial court's admonition not to introduce evidence of workmen's compensation benefits into a personal injury case. In Mangan v. Broderick & Bascom Rope Co., 351 F.2d 24, 29 (7th Cir. 1965), cert. denied, 383 U.S. 926, 86 S.Ct. 930, 16 L.Ed.2d 846 (1966), we stated that "[c]ounsel's willingness to inject that evidence into the case at any cost is sufficient to earn him a new trial for plaintiff." In the same case attorney Hubbard's conduct in cross-examining a witness upon an exhibit which was not in evidence and which was never offered in evidence was characterized as "such a deliberate misuse of the judicial process that it must not be repeated upon a retrial of this suit." Id. at 31. See also Quality Molding Co. v. American Nat'l Fire Ins. Co., 287 F.2d 313, 315–16 (7th Cir.), cert. denied, 368 U.S. 826, 82 S.Ct.

45, 7 L.Ed.2d 29 (1961); O'Shea v. Jewel Tea Co., 233 F.2d 530 (7th Cir. 1956).

Even more recently, in Kiefel v. Las Vegas Hacienda, Inc., 39 F.R.D. 592 (N.D.Ill.1966), Judge Robson took attorney Hubbard to task and granted the plaintiff a new trial where counsel knowingly made prejudicial insinuations in his opening statement which were not substantiated by evidence, thwarted the efforts of opposing counsel to obtain the appearance of an out-of-town court reporter to testify regarding a deposition which had not been filed (in violation of the rules of court), and engaged in cross-examination tactics similar to those employed in this case. Judge Robson stated:

The court grants this motion for a new trial solely from its own observation of defense counsel's tactics, irrespective of the citation of similar action by the Illinois courts occasioned by the same counsel's conduct in the same regard [citing Ryan v. Monson, 33 Ill.App.2d 406, 179 N.E.2d 449 (1961); Cline v. Kirchwehm Bros. Cartage Co., 42 Ill. App.2d 85, 191 N.E.2d 410 (1963)]. The decisions do, however, furnish corroboration that his acts were not mere happenstance, inadvertently and unintentionally occurring. In contrast, the court notes the strenuous and futile efforts of plaintiff's counsel to combat the insidious effect resulting from the artfully planted statements of defense counsel.

\*     \*     \*     \*     \*

Counsel for defendant is a lawyer who has had long and extensive trial experience. These years in the court should have taught him compassion and a sense of fair play. Instead, he seeks to use his experience to assert and apply every sly trick and strategem to win his case. He does this with the hope that he can stay within the bounds of professional ethics. In this instance, he has far overstepped the bounds. Id. 39 F.R.D. at 593–594, 596.

ture was elevated to the desired angle by a screw mechanism driven by an electric motor drawing power from the truck battery. After the ladder was elevated the sections were extended to the desired height or retracted by a hand-cranked winch mechanism, using wire cable running through pulleys attached to rungs on each of the two upper or "fly" sections. When the ladder sections were extended to the desired height they were locked in place by two automatic "fly locks," located on each of the two fly sections. In order to set the fly locks, the ladder sections were raised slightly above the desired height. The sections were then lowered until the fly locks hooked onto a rung of the section immediately below by means of a spring device.

The cable and pulley mechanism operated by the hand-cranked winch was designed only for the purpose of extending or retracting the two fly sections. Before the ladder was ready for use the fly locks had to be in position, locking the three sections. This fact was known by the plaintiff as well as all the other experienced firemen who testified. If the locks were not in position, whatever weight or stress was added to the ladder sections would be placed upon the cable and pulley mechanism.

The accident in question occurred on March 13, 1959, almost seven years after the equipment had been delivered to Batavia. Fire Truck No. 2, equipped with the aerial ladder, was called to Aurora, Illinois to assist in fighting a fire at a home for the aged. Upon arrival the aerial ladder was used with a ladder pipe fixed to the top, connected by a two and one-half inch hose.[3] The plaintiff climbed the ladder and directed water on the burning building for some time, until he received instructions from the fire chief to lower the ladder and move the equipment to another position. The plaintiff descended the ladder. In attempting to shut off the water a valve pin broke and it became impossible to drain the water from the hose leading up the ladder to the ladder pipe. The fire chief began putting a clamp on the hose to cut off the water. While this was being done, the plaintiff undertook to extend the ladder with the winch to disengage the fly locks preliminary to retracting the ladder. He extended the ladder about six inches, thereby disengaging the locks, but was unable to retract it. Then, knowing that the fly locks were disengaged and that the hose was still charged with water, the plaintiff started to climb the ladder to see what was causing the ladder sections to bind together. The fire chief saw him start up the ladder and ran to order him off, but he was too late. When the plaintiff reached the second or center section of the ladder a pulley ruptured, the cable slipped off the pulley, and the ladder telescoped. The plaintiff fell to the ground, sustaining serious and permanent injuries.

The action taken by the plaintiff in ascending the ladder was completely unnecessary. The extended ladder could have been lowered to a horizontal position by the electrically driven screw mechanism. Then, whatever was keeping the ladder from retracting could have been found and corrected without exposing anyone to danger. The plaintiff testified that he knew that the purpose of the fly locks was "to lock the ladder in place as a safety measure and as a stability feature * * * to stabilize the ladder and to make the ladder safe." Nevertheless, he knowingly and deliberately climbed the ladder with the fly locks disengaged. In Day v. Barber-Colman Co., 10 Ill.App.2d 494, 135 N.E.2d 231, 239 (1956) the court declared:

Where a plaintiff is thoroughly familiar with a possible hazard involved in

3. When so used the proper procedure was to drain the water from the hose before lowering the ladder.

the performance of his job and with the means to avoid such, the fact that at a particular time he may have been momentarily unmindful thereof, forgetful thereof, or have overlooked the same does not absolve him from the duty of observing due care for his own safety.

The plaintiff's conduct is less excusable here, even though it may have occurred under circumstances demanding prompt action, since his knowledge of the function of the fly locks was not even momentarily obscured.

■■ It is a truism to observe that no mechanical device can be made accident-proof. If it is misused it may cause injury, regardless of the method of manufacture. As stated by the New York Court of Appeals in Campo v. Scofield, 301 N.Y. 468, 95 N.E.2d 802, 804 (1950) [quoted with approval in Murphy v. Cory Pump & Supply Co., 47 Ill.App.2d 382, 197 N.E.2d 849, 857 (1964)]:

We have not yet reached the state where a manufacturer is under the duty of making a machine accident proof or foolproof. Just as the manufacturer is under no obligation, in order to guard against injury resulting from deterioration, to furnish a machine that will not wear out * * *, so he is under no duty to guard against injury from a patent peril or from a source manifestly dangerous. * * *

In other words, the manufacturer is under no duty to render a machine or or other article "more" safe—as long as the danger to be avoided is obvious and patent to all.

The plaintiff was an experienced and trained professional fireman. He was thoroughly familiar with the operation of the aerial ladder. His action in climbing it, knowing that the fly locks were disengaged, establishes as a matter of law that his injuries resulted from a misuse of equipment or contributory negligence on his part, rather than from any fault of the defendants.

The judgment is affirmed.