Concetta DeROSA, as Administratrix of the goods, chattels and credits of William V. DeRosa, deceased; and Concetta DeRosa, individually, Plaintiff,

v.

REMINGTON ARMS CO., INC., Defendant.

No. 78 Civ. 110.

United States District Court, E. D. New York.

Feb. 5, 1981.

Speiser & Krause, P. C., New York City, for plaintiff; Lawrence Goldhirsch, New York City, of counsel.

Crowe, McCoy, Agoglia, Fogarty & Zweibel, P. C., Mineola, N. Y., for defendant; Patrick J. Fogarty, Ray Carey, Mineola, N. Y., of counsel.

## MEMORANDUM AND ORDER

WEINSTEIN, Chief Judge:

Defendant Remington Arms seeks to overturn a jury determination holding it partially liable, in negligence and strict liability, for the fatal injuries suffered by Suffolk County Police Officer William V. DeRosa when the Remington shotgun carried by one of his fellow officers was accidentally discharged. Officer DeRosa's widow brought this action contending that the force required to pull the trigger on the shotgun—the trigger pull—was designed to be so low that the gun was unreasonably dangerous for its foreseeable use in police work, and that it was this defect in design which caused her husband's death.

Remington impleaded Officer Kenneth Paton who fired the shotgun and Suffolk County and its Police Department, contending that responsibility for the accident should lie with them. Suffolk County subsequently settled with plaintiff on its own and Paton's behalf.

After a trial at which the plaintiff attempted to establish that Remington acted unreasonably in failing to incorporate this hypothetical design improvement to increase the pressure required to pull the shotgun's trigger, the jury found against all three defendants, allocating 36% of liability to Remington, 35% to Suffolk County's police department and the remaining 29% to Officer Paton.

Defendant Remington moves for judgment notwithstanding the verdict. The motion is granted. Liability against Remington Arms on the basis of an alleged design defect in the trigger pull of its Model 870P shotgun cannot be sustained either on a theory of negligence or on a theory of strict product liability. Based upon the evidence, the shotgun as designed by Remington was as a matter of law not unreasonably dangerous for its foreseeable use. Moreover, the intervening carelessness of fellow officer Paton was such that no defect in design of the gun can be said to have caused this tragedy.

## FACTS

The Remington Model 870P carried by Officer Kenneth Paton on the night Officer DeRosa was shot is a version of Remington's standard Model 870 hunting shotgun modified for police use. Remington has sold approximately three million of the standard Model 870's, primarily to hunters. It has sold approximately seventy-five thousand Model 870P shotguns since the introduction of the modified version roughly twenty-five years ago. The 870P is now used by eighty percent of all law enforcement agencies in the United States. Institutions using the weapon include the FBI, Secret Service, United States Marshals, United States Border Patrol, United States Drug Enforcement Administration, Internal Revenue Service, Coast Guard, and Marine Corps as well as many state and local law enforcement agencies. The Suffolk County Police Department purchased twenty-four 870P shotguns in 1967, mainly for riot use, and had approximately one hundred sixty

of the weapons by the beginning of 1976 when the shooting occurred.

Like the 870, the 870P has three widely-accepted safety devices designed to guard against accidental firings: a mechanical device which until disengaged locks the trigger and prevents the gun from being fired; a trigger guard that is intended to prevent idle bumps from causing inadvertent firings—by requiring that the trigger finger be placed inside the guard; and, finally, a pump action whose operation by positively pushing it into a closed position is a prerequisite to firing.

The trigger pull of the standard Model 870 shotgun is set by the manufacturer at four-and-one-half pounds to be within parameters for shotguns maintained and respected by the firearms industry: viz., three-and-three-quarters to six-and-one-half pounds. The usual handgun carried by police officers also has a trigger pull of approximately four-and-one-half pounds after the weapon is cocked.

Industry guidelines on trigger pull force are designed to enhance accuracy in firing while also allowing sufficient firing speed. Uniformity helps make these weapons interchangeable since users need not reeducate reflexes trained to other specifications. This feature is especially valuable in the case of law enforcement personnel, many of whom are also hunters; moreover, moves from one law enforcement agency to another are not uncommon.

The purchasers of these weapons—law enforcement agencies—and their eventual professional users are experts in the use of firearms. Law enforcement officers are instructed in the safe operation of this dangerous equipment under conditions of stress. Suffolk County gives extensive and rigorous training and refresher courses at which police officers are warned not to disengage any of the three safety devices until immediately before deliberately aiming and firing. Emphasis on safety is constantly drilled into them and repeated test firings on the Suffolk range reinforce what they must know about the trigger pressure required on the shotguns issued to them.

On the night of January 31, 1976, Paton and his partner were dispatched to the scene of a suspected violent disturbance in North Amityville, Long Island. Having been alerted that several shots had been fired, Officer Paton readied his Model 870P Remington shotgun—loading it and disengaging the mechanical safety while still in the patrol car—itself a violation of police procedures since the safety should not have been touched until there was an intention to fire. On his arrival at the scene, it became clear that no weapons were required and Officer Paton proceeded to return the shotgun to his patrol car. He attempted to unload before placing the gun in the car, but neglected to re-engage the safety as required by instructions relating to unloading provided by both the manufacturer and the Suffolk County Police Department. He also must have moved up the pump action and slipped his trigger finger inside the trigger guard—both actions in clear violation of police and manufacturer's manual instructions. None of these violations of standard procedure was required by the need to take speedy action because, as was demonstrated in the courtroom, all three safety features could be disengaged within a fraction of a second.

Paton was having some difficulty removing the shell when shouts from the crowd prompted him to turn. As he noticed a car approaching rapidly without headlights, the shotgun he was holding discharged, killing Officer DeRosa.

He has no clear recollection of the sequence of events which led to the shooting. He does not recall moving the pump action of the shotgun, nor having his finger inside the trigger guide, nor pulling the trigger, but acknowledges that he must have done all three in order for the gun to have fired. The safety, as noted, was already disengaged.

In subsequent laboratory tests, the shotgun was found to have been in good working order. The trigger pull was set exactly as it had been designed to be. The gun has been returned to service by the Suffolk County Police Department.

## CONTENTIONS OF THE PARTIES

It is the plaintiff's contention that the trigger pull force of the 870P should have been increased from the standard four-and-one-half pounds on the 870 to a force of about fifteen pounds in order to prevent accidental discharges of the kind that killed Officer DeRosa. She argues that a shotgun intended for police use which did not incorporate this stronger pull was defectively designed; that it was unreasonably dangerous for its intended use and for foreseeable misuse. In support of this hypothetical design improvement, plaintiff introduced the testimony of a "human factors analyst" who testified that at the time the weapon was modified Remington should have determined the likelihood of inadvertent firings under the conditions of stress likely to be encountered in police work. Further research, he indicated, would have demonstrated that all police personnel could exert a finger pressure of fifteen pounds and that this increased pressure would have substantially reduced the possibility of inadvertent discharges. The cost of increasing the trigger pull force on the 870P was no more than a few pennies per gun.

Remington argues that its use of a four-and-one-half pound trigger pull on the Model 870P was a reasonable design choice. It argues that the design was not the cause of the accident. In support of these contentions the defendant relies upon the trigger pull force standards maintained by the industry in the interest of uniformity; the three safety devices incorporated into the 870P; plaintiff's failure to prove that the proposed human factors analysis would have supported a decision to provide a heavier trigger pull; and plaintiff's failure to establish at trial the amount of force actually used by Officer Paton to pull the trigger of the shotgun on the night of the shooting—i. e., whether it was under the fifteen pounds suggested by plaintiff's expert. Remington further argues that Officer Paton's gross mishandling of the weapon in clear contravention of established police procedures and manual instructions was the cause of the accidental firing.

## NO DESIGN DEFECT

■ In New York, three broad categories of product defects can expose manufacturers to liability in negligence and strict product liability, when such defects cause injury in the course of intended and reasonably foreseeable unintended uses: first, mistakes in manufacturing which render the product dangerous and cause harm, see, e. g., Codling v. Paglia, 32 N.Y.2d 330, 345 N.Y.S.2d 461, 298 N.E.2d 622 (1973); second, absence of, or inadequacy of, warnings accompanying a product which causes harm, see, e. g., Torrogrossa v. Towmotor Co., 44 N.Y.2d 709, 405 N.Y.S.2d 448, 376 N.E.2d 920 (1978); and, finally, defects in design, see, e. g., Robinson v. Reed-Prentice Division, Etc., 49 N.Y.2d 471, 426 N.Y.S.2d 717, 403 N.E.2d 440 (1980); Micallef v. Miehle Co., Etc., 39 N.Y.2d 376, 384 N.Y.S.2d 115, 348 N.E.2d 571 (1976). It is on this last category of defect that plaintiff bases her claim against Remington Arms.

A defect in design presents problems unique in the area of product liability for, if such a defect exists at all, it is the result of an intentional choice made by the manufacturer after considering competing options:

> By definition the product has been manufactured in accordance with its design, and the design meets the specifications devised by the manufacturer ... [P]laintiff's safety is *not* the only legitimate design goal ... a manufacturer must consider nonsafety factors as well. He must consider cost: some designs, however safe, are simply too expensive to be marketable ... He must consider efficiency....

> Given the conflict between various design goals it follows that in choosing a design a manufacturer must balance the risks and costs of a design against its benefits. As a result, the manufacturer may decide to reject the design which would have prevented plaintiff's injury on the grounds that it is too likely to cause other kinds of injuries, too inefficient, or too costly.

Murphy & Santagata, Analyzing Product Liability—Design Defects—Allocation of Responsibility for Product-Caused Injuries in the Workplace, Legislative Drafting Fund of Columbia University 11 (1979).

While the balancing associated with establishing negligence for design defect has typically reflected the inevitable judgments which inhere in the process of designing a product, *see, e. g., Micallef v. Miehle Co., Etc.*, 39 N.Y.2d 376, 384 N.Y.S.2d 115, 348 N.E.2d 571 (1976), the New York Court of Appeals has recently made its recognition of that process even more explicit through its incorporation of a negligence-type balancing into a cause of action in strict liability for design defect. Thus, in defining a design defect for purposes of strict liability, the court wrote in *Robinson v. Reed-Prentice Division, Etc.*, 49 N.Y.2d 471, 426 N.Y.S.2d 717, 720, 403 N.E.2d 440, 443 (1980):

> Where a product presents an unreasonable risk of harm, notwithstanding that it was meticulously made according to detailed plans and specifications, it is said to be defectively designed... [S]ome products, for example knives, must by their very nature be dangerous in order to be functional. [A] defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use: that is, one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce... Since no product may be completely accident proof, *the ultimate question in determining whether an article is defectively designed involves a balancing of the likelihood of harm against the burden of taking precaution against that harm.*

(Emphasis supplied.)

In *Robinson*, the Court of Appeals also laid out the familiar, and noticeably similar, elements of a cause of action in negligence for design defect:

> Well settled it is that a manufacturer is under a duty to use reasonable care in designing his product when 'used in the manner for which the product was intended * * * as well as an unintended yet reasonably foreseeable use.' ... It is the manufacturer who must bear the responsibility if its purposeful design choice presents an unreasonable danger to users. A cause of action in negligence will lie where it can be shown that a manufacturer was responsible for a defect that caused injury and that the manufacturer could have foreseen the injury.

426 N.Y.S.2d at 721, 403 N.E.2d at 444 (citations omitted). *See also Micallef v. Miehle Co., Etc.*, 39 N.Y.2d 376, 384 N.Y.S.2d 115, 121, 348 N.E.2d 571, 577 (1976) ("a manufacturer is obligated to exercise that degree of care in his plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which it was intended ... as well as an unintended yet reasonably foreseeable use").

■■■ Thus, under either theory a product is defectively designed only when it presents an unreasonable risk of harm in light of other design considerations; liability is imposed where that defect is a substantial factor in bringing about plaintiff's injuries when the product is being used in a reasonably foreseeable manner. The two theories of negligence and strict liability for design defect are, in New York, almost functionally equivalent. *Lancaster Silo & Block v. Northern Propane Gas*, 75 App. Div.2d 55, 427 N.Y.S.2d 1009, 1013 (4th Dep't 1980) ("in a design defect case there is almost no difference between a prima facie case in negligence and one in strict liability"); *cf.* Final Report of the Legal Study, Interagency Task Force on Product Liability, U.S. Department of Commerce Rep. No. ITFPL–77/OL, pp. II–8–9 (1977).

While we note that the New York Court of Appeals' most recent products liability decision stresses differences between strict liability and negligence causes of action in the area of manufacturing defects, *Caprara v. Chrysler*, 52 N.Y.2d 114, 436 N.Y.S.2d 251, 417 N.E.2d 545, 1981, its language does not apply to design defect which presents

considerations addressed at length in *Robinson v. Reed-Prentice Division, Etc.*, 49 N.Y.2d 471, 426 N.Y.S.2d 717, 403 N.E.2d 440 (1980). *See, Rainbow v. Albert Elia Bldg. Co., Inc.*, 79 A.D.2d 287, 436 N.Y.S.2d 480, 484 (4th Dept. 1981).

The subject of this lawsuit is a product whose very purpose is to cause injury—to kill and to wound. In its Final Report, the Interagency Task Force on Product Liability of the Commerce Department discussed such dangerous products, suggesting that they not be labeled defective merely because they pose a "commonly known danger":

> the danger of the product may be such common knowledge that the product cannot be considered to be defective. "Although a knife qualifies as an obviously dangerous instrumentality," for example, "a manufacturer need not guard against the danger that it presents." This type of hazard is an inherent risk of the product; it is also one that all reasonable persons would be aware of in the course of using the product.

Final Report, Interagency Task Force on Product Liability, U.S. Department of Commerce (1978), p. II–11, *quoting Dorsey v. Yoder*, 331 F.Supp. 753, 759 (E.D.Pa.1971), *aff'd without opinion*, 474 F.2d 1339 (3d Cir. 1973). Similarly, Comment k to section 402A of the Restatement of Torts 2d describes what are commonly called "unavoidably unsafe products":

> There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs... The seller of such products, again with the qualification that they are properly marketed and proper warning is given where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable danger.

*See also*, e. g., *Robinson v. Reed-Prentice Division, Etc.*, 49 N.Y.2d 471, 426 N.Y.S.2d 717, 720, 403 N.E.2d 440, 442 (1980) (referring to knives as illustrative of functionally dangerous articles); *Lindsay and Lindsay v. Ortho Pharmaceutical Corporation*, 637 F.2d 87 at 90 (2d Cir. 1980) ("ethical or prescription drugs [are] aptly described as 'unavoidably unsafe products' [and are] not deemed defective or unreasonably dangerous so long as they are accompanied by proper directions for use and adequate warnings as to potential side effects").

Remington did not conduct "human factors" analysis with respect to the trigger pull force during its modification of the standard 870 shotgun and it was established at trial that the Remington engineer with responsibility for testing the modified weapon was not informed of the gun's intended use by law enforcement personnel. But the expert testimony to the effect that a stronger pull would have made the difference between the occurrence of this accident and its prevention was entirely speculative. The expert called by plaintiff to establish that connection concededly had no experience with trigger pulls or police weapons and offered his theoretical opinion without the benefit of any studies of the effects of different trigger pull forces to support his conclusions.

There was no evidence to suggest that in the excitement of the moment, the pull on the trigger by Paton did not far exceed the fifteen pounds suggested by plaintiff's expert as proper. The combination of Paton's errors suggest a high degree of nervous tension making it highly likely that any practical trigger pull pressure would have been exceeded.

To be balanced against the dubious utility of increasing the force required to pull the trigger of the modified shotgun was the overall cost of making such a change. That price is not to be measured in money, since it is conceded that any modification would have involved an insignificant expenditure. Rather, the cost must be calculated in lost efficiency, accuracy and uniformity, since any change in the mechanism of a firearm presents new considerations to which users must accommodate. As Professor Arthur W. Murphy and Kenneth V.

Santagata have pointed out with respect to design choices and defects, a manufacturer must, in addition to the actual dollar cost of making a product perfectly safe (if such a thing were possible),

> consider the overall safety of a design. A design which provides absolute protection against one kind of injury might increase the likelihood or seriousness of another kind of injury. For example, a properly designed seatbelt will give protection from crash injuries but may impede rapid exit from a car in case of fire.

Analyzing Product Liability 11 (1979).

■ Based on the evidence, one factor the designer of this shotgun would have had to consider was that any sharp increase in the amount of pressure required to pull a trigger could have a deleterious effect on the accuracy and speed of a marksman—especially one trained to use a firearm of the same type equipped with a lighter trigger pull. In the light of such countervailing considerations, Remington's decision to use the standard pull cannot be considered unreasonable.

■ Conformity to industry standards—here, the four-and-one-half pound pull falling within the parameters of three-and-three-quarters to six-and-one-half pounds to which Remington points as evidence of its reasonableness—is not in itself dispositive of the question of whether or not a manufacturer's design choice is reasonable. *See* 1 Frumer & Friedman, Products Liability § 7.01(4) and cases cited in note 22. In an industry in which the buyers themselves prescribe requirements for a particular product they may set standards so low that any manufacturer purveying a conforming product is supplying one that is unreasonably dangerous. *Cf. Pust v. Union Supply Co.,* 561 P.2d 355, 361 (Colo.App.1977), *aff'd,* 583 P.2d 276 (Colo.1978) (where individual purchaser supplied specifications, a "fabricator ... cannot avoid liability even if the design submitted is unsafe, provided it is feasible for him to install safety devices"). But that is not the situation here, where the buyers of this Remington shotgun are professional law enforcement and other governmental agencies whose specifications are presumably based on expert and careful calculations of need and full recognition of the setting in which the weapon will be used.

It has, so far as the record shows, been the considered opinion of law enforcement agencies that the doubtful utility of increasing the trigger pull force of the 870P in the prevention of serious and deliberate misuse of this product, already equipped with three adequate safety devices, was and is outweighed by the predictable grave consequences of reduced efficiency and accuracy and the loss of uniformity of such a design change. We therefore must conclude that the shotgun did not, in the form of its trigger pull force, present an unreasonably dangerous design defect, and that Remington did not act unreasonably by failing to incorporate a stronger trigger pull into the Model 870P.

■ In New York it is well settled—both in negligence and strict liability—that the intervening negligence of a third party will not generally relieve an otherwise liable party of its responsibility for harm if that intervening action could have been foreseen, *Bolm v. Triumph Corp.,* 33 N.Y. 2d 151, 159, 350 N.Y.S.2d 644, 645, 650, 305 N.E.2d 769, 770, 773 (1973), and that a manufacturer must design his product so that it avoids unreasonable risk of harm when the product is being used for an "unintended yet reasonably foreseeable use." *Micallef v. Miehle Co., Inc.,* 39 N.Y.2d 376, 385–86, 384 N.Y.S.2d 115, 121 (1976). *Caiazzo v. Volkswagenwerk, A. G.,* 468 F.Supp. 593, 600 (E.D.N.Y.1979). A manufacturer in New York is not, however, required to act as an insurer with respect to its product, *Bernstein v. Remington Arms,* 16 A.D.2d 694, 227 N.Y.S.2d 802 (2d Dep't 1962), nor to protect against every conceivable misuse by its design choices. Neither in strict liability nor negligence is a manufacturer to be held absolutely liable for all harm occasioned by its product since no product can be made absolutely safe or completely accident-proof. *Robinson v. Reed-Prentice Division, Etc.,* 49 N.Y.2d 471, 426 N.Y.S.2d 717, 720, 721, 403 N.E.2d 440, 443 (1980) (declining to impose "absolute liability on manufacturers for all product-

related injuries"); *Micallef v. Miehle Co., Etc.*, 39 N.Y.2d 376, 384 N.Y.S.2d 115, 122, 348 N.E.2d 571, 578 (1976) (causes of action in both negligence and strict liability).

Thus, while a manufacturer is under a "non-delegable duty to design and produce a product that is not defective," *Robinson*, 426 N.Y.S.2d at 720, 403 N.E.2d at 442, deliberate bypassing of safety devices for no reason associated with the user's need to utilize the product effectively need not be guarded against. The manufacturer's duty:

> does not extend to designing a product that is impossible to abuse or one whose safety features may not be circumvented. A manufacturer need not incorporate safety features into its product so as to guarantee that no harm will come to every user [or bystander] no matter how careless or even reckless [the user may be.]

*Id.* at 721, 403 N.E.2d at 444. On this basis the Court of Appeals in *Robinson* refused to hold liable in either negligence or strict product liability a manufacturer which had produced a machine whose safety device was disabled by the purchaser subsequent to delivery in order better to suit its own production needs. On the question of strict liability, the *Robinson* court described in detail the problem of attributing to allegedly defective design accidents caused by abuse:

> Principles of foreseeability ... are inapposite where a third party affirmatively abuses a product by consciously bypassing built-in safety features. While it may be foreseeable that an employer will abuse a product to meet its own production needs, responsibility for that willful choice may not fall on the manufacturer. Absent any showing that there was some defect in the design of the safety gate at the time the machine left the practical control of [the manufacturer] (and there has been none here), [the manufacturer] may not be cast in damages for strict liability.

*Robinson*, 426 N.Y.S.2d at 721, 403 N.E.2d at 443. The instant case is a far stronger one for finding lack of proximate cause or foreseeability. As the dissent in *Robinson* pointed out, the purchaser there had permanently bypassed safety devices with knowledge of the manufacturer who was also aware that the safety feature could not be used without interfering with the manufacturing process. Here there was no need to bypass existing safety features since the weapon's utility was not adversely affected by those devices; there was instead an almost inexplicably careless failure of the user to conform to required practice.

This case is even stronger than *Neusus v. Sponholtz*, 369 F.2d 259 (7th Cir. 1966), where the plaintiff in a design defect case—a professional fireman—extended and climbed a ladder manufactured by the defendant without engaging the safety mechanism. The Seventh Circuit held that:

> plaintiff was an experienced and trained professional fireman ... thoroughly familiar with the operation of the aerial ladder. His action in climbing it, knowing that the fly locks were disengaged, establishes as a matter of law that his injuries resulted from a misuse of equipment or contributory negligence on his part.
>
> It is a truism to observe that no mechanical device can be made accident-proof. If it is misused it may cause injury, regardless of the method of manufacture.

369 F.2d at 259. In *Neusus* a single safety device had to be engaged, while here three safety protections had to be disengaged.

> Sadly it must be acknowledged that: [m]any products, however well-built or well-designed may cause injury or death. Guns may kill; knives may maim; liquor may cause alcoholism; but the mere fact of injury does not entitle the [person injured] to recover ... there must be something wrong with the product, and if nothing is wrong there will be no liability.

Murphy & Santagata, Analyzing Product Liability 4 (1979) (footnotes omitted). Just as an extension ladder must be designed so as finally to unlock and fold away as well as to support the weight of a fireman, so too must a gun be designed so that it finally

can be fired: its safety mechanisms must at some point be capable of being disengaged.

## NO CAUSATION

 Whether or not the design of the trigger pull was unreasonably dangerous, it is clear from the evidence presented at trial that the harm to Officer DeRosa was not caused by Remington's design choice with respect to the force required to pull the trigger, where the user of Remington's product—a well trained and experienced professional policeman—had unnecessarily bypassed every safety device designed to protect against accidental firings. Had they not been deliberately disengaged by Officer Paton in violation of police procedure, these widely-accepted safety devices would have prevented this accident. Moreover, plaintiff's inability at trial to establish with any degree of probability the force actually used by Officer Paton to pull the trigger on that night calls into serious question the relevance of her contention that Remington's choice of a four-and-one-half pound trigger pull rendered the weapon unreasonably dangerous.

## CONCLUSION

The jury's great and understandable sympathy for Officer DeRosa's widow may have led it to find in her favor against Remington, but such sympathy—however justified—cannot be the basis for the imposition of liability where none may be imposed under New York substantive law.

The complaint is dismissed without costs or disbursements.

So ordered.